# KIMBERLY v. ARMS.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION.

No. 169. Argued January 21, 22, 1889. — Decided March 5, 1889.

It is not within the general province of a master in chancery to pass upon all the issues in a cause in equity; nor is it competent for the court to refer the entire decision of a case to him without consent of the parties.

When the parties consent to the reference of a case to a master or other officer to hear and decide all the issues therein, both of fact and of law, and such reference is entered as a rule of court, it is a submission of the controversy to a special tribunal, selected by the parties, to be governed in its conduct by the ordinary rules applicable to the administration of justice in tribunals established by law; and its determinations are not subject to be set aside and disregarded at the discretion of the court.

In practice it is not usual for the court to reject the report of a master, with his findings upon the matters referred to him, unless exceptions are taken to them, and brought to its attention, and unless, upon examination, the findings are found unsupported or essentially defective.

The law exacts good faith and fair dealing between partners, to the exclusion of all arrangements which can possibly affect injuriously the profits of the concern.

If one partner is the active agent of the firm, and as such receives a salary beyond what comes to him from his interest as partner, he is clothed with a double trust in his relations with the other partner which imposes upon him the utmost good faith in his dealings; and if he obtains anything to his own benefit in disregard of that trust, a court of equity will subject it to the benefit of the partnership.

When a letter is mailed, addressed to a person at his post-office address, the presumption is that he receives it.

In EQUITY. The court, in its opinion, made the following statement of the case:

On the 27th of April, 1878, the complainant, Kimberly, and the defendant, Hannah M. Arms, executed the following articles of agreement:

"Articles of agreement made and concluded this 27th day of April, A.D. 1878, by and between Hannah M. Arms, of Youngstown, Mahoning County and State of Ohio, party of the first part, and Peter L. Kimberly, of Sharon, Mercer County and State of Pennsylvania, of the other part, witnesseth, That the said parties have agreed, and by these presents do agree, to associate themselves in the art, trade and business of leasing, prospecting, buying, mining, working and operating and dealing in lead, iron, silver, gold and other minerals, together with the lands on which the same may be located, and to do and perform all things belonging to said trade or business, which said copartnership shall commence on the 27th day of April, A.D. 1878, and continue until dissolved by either or both of said parties. And to that end and purpose said Hannah M. Arms has this day paid in as capital stock six thousand dollars, and the said Peter L. Kimberly has paid in as capital stock six thousand dollars, which said twelve thousand dollars shall be used, laid out and employed in common between them for their mutual advantage. It is also agreed that all gains, profits and increase as shall arise by reason of said joint business shall be divided equally, share and share alike, between said parties, and that all losses that shall happen to said joint business shall be shared and borne equally between said parties alike.

"That said business shall be carried on under the name and

style of Arms & Kimberly, Charles D. Arms, agent. That Charles D. Arms shall act as agent for said firm, and receive in compensation for his services the sum of twenty-five hundred dollars per annum, or at that rate, while in their employ. That said business shall be carried on in the Territories or States in the United States, or some of them.

"Witness our hands and seals the day and year aforesaid, at Youngstown, O.

"P. L. KIMBERLY.　[SEAL.]

"HANNAH M. ARMS.　[SEAL.]"

Hannah M. Arms was the wife of the defendant Charles D. Arms, and the instrument, though signed by her, was intended to express an agreement on his part, his name not being used because at the time he was financially embarrassed. She was always treated as a mere nominal party, and he was treated as the real party. On the 10th of May following, Kimberly, having become embarrassed financially, assigned his interest. in the partnership thus formed to Edwin M. Ohl. This assignment was made to prevent any interruption in the business of the partnership, Arms having already gone to Arizona in its prosecution. Kimberly took at the time from Ohl a declaration showing that the latter had no personal interest in the partnership, or in the properties that had been or might be acquired by it, but held the interest assigned to him as the trustee of Kimberly. In all subsequent proceedings Kimberly and Charles D. Arms considered and treated each other as the real and sole parties in the partnership, and as solely interested in the properties which it acquired.

Under this contract, and about the first of May following, Arms went to Arizona on the business of the firm, taking with him all its capital, viz., $12,000, to use in its business and to pay his expenses and salary. Whilst there he had his headquarters at Tucson, the capital of the Territory, where he became acquainted with two persons by the name of Witherell and Gage, who were largely interested in property known as the Grand Central Mine, which was reputed to be of great value, and was owned by the Grand Central Mining Company

of Arizona, a corporation created under the laws of Missouri. From them Arms learned of the reputed value of the property, and very naturally became desirous of examining it, and, if found to be as valuable as reported, to acquire an interest in it. Accordingly, in November following, in company with Witherell and two other other persons by the names of Whiteside and Austin, who were also interested in the mine, he went to see the property, travelling a distance of about two hundred miles, a portion of the way through the Apache territory, where they had an escort of soldiers. The expenses attending this visit were large and were borne by Arms and Kimberly. Arms examined the property and found good ore in it. He was informed by one of his companions, Whiteside, that he had in a crude way reduced four tons of ore and obtained $900 in silver. Soon afterwards Arms returned to Ohio, met Kimberly, and reported that he had expended all the moneys of the firm except three twenty-dollar gold pieces. It does not appear that any further account of his expenditure of the moneys was ever rendered.

On the 24th of March, 1879, Arms and Kimberly, after consultation, concluded that it was advisable to increase the capital of their firm to $25,000, and accordingly did so, indorsing upon the original articles an agreement to that effect, signed H. M. Arms by C. D. Arms, and E. N. Ohl, and, pursuant to it, each party paid $6500, Kimberly paying his share to Arms. With this increased capital Arms returned to Arizona, leaving about the first of April, and was there until some time in the following July. Other sums were advanced by Kimberly in the business of the firm as they were from time to time needed. Whilst in the Territory, Arms again made a visit to the Grand Central Mine in company with a mining expert whom he had employed. The expenses of the trip and for the services of the expert were charged to the firm and paid. It is not necessary to state here the different steps taken by Arms which resulted in his acquiring an interest in the Grand Central Mine, by the purchase of a large number of shares of the company owning it with moneys borrowed of one N. K. Fairbank, of Chicago,

for the facts respecting this transaction are detailed in the findings of the master to whom the case was referred, which are hereafter given. The capital of the firm and other sums advanced by Kimberly were invested in various mining properties in Arizona and Colorado, the title of some of which was taken in his name, and of some in the name of Ohl, but all claims arising out of them have been adjusted and settled between the partners.

The only remaining subject of controversy between them grows out of the interest which Arms acquired in the stock of the Grand Central Mining Company, Kimberly claiming that such interest belonged to the firm, and consequently that an undivided half thereof inured to him, and Arms claiming that the interest was acquired by him in his own right and belonged to him individually. The present suit is brought to determine this disputed matter, the complainant, Kimberly, asking for an adjudication in his favor and an accounting by Arms for the stock held by him in the Grand Central Mining Company, and for certain shares in the New York Grape Sugar Company, which he had acquired by a sale of some shares of the mining company. The bill contains all the averments necessary to present the claim of Kimberly, and the answer of Arms contains all the averments necessary to disclose his defence. The answers of the other defendants are not material upon the matters in controversy. Replications to the answers being filed, testimony was taken for some time, when, on the 16th of May, 1884, the parties consented that the case should be referred to a master "to hear the evidence and decide all the issues" between them, and, upon such agreement and at the request of the parties, the court on that day entered the following order:

"By consent and request of all the parties herein, it is ordered by the court that Hon. Richard D. Harrison be and is hereby appointed a special master herein to hear the evidence and decide all the issues between the parties and make his report to this court, separately stating his findings of law and fact, together with all the evidence introduced before him, which evidence shall thereby become part of the report, which

report shall be subject to like exceptions as other reports of masters.

"It is further ordered by like consent and request that said master shall proceed upon twenty days' notice from either party to hear and determine said issues, and with full power and authority to grant such adjournments, amendments, exceptions, and motions as might be granted by the court if the trial was by the court."

Shortly after this order was made a hearing was commenced before the master, and two weeks were occupied in taking testimony and in the arguments of counsel. After holding the case under consideration until April 17, 1885, a period of eleven months, the master made his report, of which the following are the most important parts for the decision of the case, in addition to the facts stated above:

" The report of Richard A. Harrison, special master in chancery, to whom this cause stands referred for the purpose of hearing the evidence and determining all the issues between the parties, and making his report to said court, separately stating his findings of law and fact, together with all the evidence introduced before him, pursuant to an interlocutory decree, rendered at April Term, A.D. 1884.

" Having heard the evidence in the presence of the parties and their counsel, and the arguments of counsel for the parties, in the city of Cleveland, my findings of fact, from such evidence, upon all the issues between the parties, are as follows : "

[The first six findings set forth substantially the facts as to the formation of the partnership between Arms and Kimberly, its object, the original capital put in, and its subsequent increase, the visit of Arms to Arizona on its business, and the purchase of mining properties there, which are narrated above.]

" 7. In the years 1878 and 1879, prior to October, 1879, said Charles D. Arms, while acting as the agent of said partnership, and as a partner of said Kimberly, and while receiving a salary from said partnership, and at the expense of said partnership, visited the Tombstone District of Arizona, and the

mining claim then known as the 'Grand Central Mine,' which is in said district, and examined the same, and thus acquired a knowledge of the property.

"8, In the fall of 1879 the Grand Central Mining Company of Arizona, a Missouri corporation, having previously been organized with a capital stock of 800 shares of the par value of $500 per share, representing the said property known as the Grand Central Mine, E. B. Gage and W. F. Witherell, who were the holders of a large portion of said capital stock, proposed to sell a portion of the stock so held by them to said Charles D. Arms, whereupon Arms in October, 1879, came to Sharon, Pennsylvania, where said Kimberly resided, and there met said Kimberly, whereupon it was agreed between them that said Arms should go to Chicago and there arrange with N. K. Fairbank, if possible, to furnish the money to purchase stock in said Grand Central Mining Company of Arizona. Whereupon said Arms did go to Chicago, and did arrange with said Fairbank to furnish $87,500 for the purchase of said stock, and then returned to Youngstown, Ohio, and there again met said Kimberly and informed him of the arrangement he had made with said Fairbank; whereupon it was further agreed between said Arms and Kimberly that if, when Arms got back to Arizona and required the money to purchase said stock, said Fairbank should fail to furnish it, then said Kimberly, upon being notified of Fairbank's failure or refusal to furnish the money, would furnish at least $37,500 for that purpose.

"9. Immediately after making the arrangement last aforesaid, said Arms returned to Arizona, and there, on the 13th of November, 1879, obtained, in writing, from said Gage and Witherell, an option to purchase from them 225 shares of said stock at the price of $87,500 in four months from said date. Said Gage and Witherell also agreed to give said Arms forty additional shares of stock, in case he should finally elect to purchase said 225 shares under said option, and, as a part of said transaction, said Witherell also purchased of said Arms the interest of said Arms and Kimberly in certain mining properties known as the Mexican mine, at and for

the price of $4500. Afterwards, and prior to March 4th, 1880, said Arms elected to purchase said stock under said option; and, of said 225 shares,

|  |  |  |
|---|---|---|
| He received . . . . . . . . . . . . . | 210 | shares |
| Also said (bonus) . . . . . . . . . . | 40 | " |
| He also purchased of George P. Reed . . | 51 | " |
| And of E. B. Gage . . . . . . . . | 23 | " |
| Making in all acquired by said Arms . | 324 | " |

" 10. For the purchase of 324 shares, and for assessments upon said stock to pay the expenses of developing said mine and for machinery, said Fairbank advanced to said Arms various sums of money, from time to time; which sums, including interest thereon up to October 13, 1880, aggregated $162,498.08. On or about the 13th of October, 1880, said Arms and Fairbank made a settlement of the moneys so advanced by said Fairbank and of the stock so acquired by said Arms; and said Fairbank received and accepted from said Arms 184 shares of said 324 shares of stock, in full payment and satisfaction of the moneys so advanced by him; leaving said Arms the holder of 140 shares of said stock.

" 11. Afterwards, to wit, on or about the ―― day of ――――, 1881, the Grand Central Mining Company, an Ohio corporation, and a defendant in this suit, was formed and organized, with a capital stock of 100,000 shares of the par value of $100 per share; and said Arms converted said 140 shares of said Missouri corporation into 17,500 shares of said Ohio corporation.

" 12. On the 4th of March, 1880, the partnership between said Arms and Kimberly was, by mutual consent, dissolved by them; Arms then claiming that said interest in said Grand Central Mining Company was his own individual property; which claim said Kimberly then disputed, and insisted that said interest belonged to said Arms and himself jointly, in equal proportions. On the 5th of March, 1880, said Edwin N. Ohl signed and delivered to said Arms an instrument of writing whereby he (said Ohl) agreed to convey, upon demand, the property held by him for said firm to said Arms

and Kimberly; and said Arms, at the same time, signed and delivered to said Ohl an instrument of writing, whereby he (said Arms) agreed to convey to said Kimberly, upon demand, all the undivided one half interest, or interests, which he, (said Arms,) had in mining lands and claims, or stocks in mining interests or claims, in the Territory of Arizona, except his interest in what was known as the Grand Central Mining Company; which said interest, it was provided in said instrument, should belong to the said Charles D. Arms absolutely.

"13. Said last-mentioned instrument of writing was not shown to said Kimberly, and he had no knowledge of its provisions until on or about the —— day of July, 1880, when, upon seeing and examining the same for the first time, and after consultation with legal counsel, he, said Kimberly, on the 22d of July, 1880, wrote, addressed and mailed to said Arms, at Youngstown, Ohio, his post-office address, a letter notifying him that he, said Kimberly, would not consent that said Arms should hold said interest in said Grand Central Mining Company as his own property, and insisting that said interest belonged to them jointly, and that he, Kimberly, would have his half of it if he was compelled to get it at the end of a law suit. The evidence does not prove that Arms actually received said letter; and I therefore do not find he received it. Said Kimberly did not know that said first-mentioned instrument was executed until after July, 1880.

"14. On the —— day of August, 1881, said Edwin N. Ohl reconveyed all of his interest in said business to said Peter L. Kimberly.

"15. On the 2nd day of September, 1881, said Kimberly, by his attorney, requested of said Charles D. Arms, who was the president of said Grand Central Mining Company, permission to examine the records and books of said company, and also that said Arms should account with him, said Kimberly, for all the business that he, said Arms, had done since he and said Kimberly had gone into the mining business, all of which said Arms refused to do."

[The 16th and 17th findings show that out of the 17,500 shares of stock of the Grand Central Mining Company, Arms,

sold to different parties, in 1881 and 1882, 4800 shares, receiving therefor in cash $68,900 and from Jebb and Bond 625 shares of stock in the New York Grape Sugar Company, and during those years received cash dividends on his shares amounting to $81,775.]

"Upon the foregoing findings of fact my findings of law are as follows:

"1. That the 12,700 shares of stock in the Grand Central Mining Company standing in the name of said Charles D. Arms on the 14th of August, 1882, and said 625 shares of stock in the New York Grape Sugar Company, received by said Charles D. Arms from said William T. Jebb and H. G. Bond, belong to said copartnership of Arms & Kimberly, composed of said Charles D. Arms and Peter L. Kimberly, and that said Peter L. Kimberly is entitled to have one half of said 12,700 shares of stock and one half of said 625 shares of stock transferred to him.

"2. That the several sums of money received by said Charles D. Arms, from the sales made by him of stock in the Grand Central Mining Company, as well as the several sums of money received by him as dividends on stock held by him in said company, also belong to said copartnership of Arms & Kimberly, composed as aforesaid of said Charles D. Arms and Peter L. Kimberly, and that said Charles D. Arms is liable to said Peter L. Kimberly for one half of said several sums of money, together with interest on such one half, at the rate of six per cent per annum from the respective dates when said moneys were received by said Charles D. Arms."

Then follows a statement showing the amount due from Charles D. Arms to Peter L. Kimberly, on account of moneys thus received by Arms, and also a statement of the depositions offered to the master by the respective parties, which were returned with his report to the court. The report concludes as follows:

"The foregoing is all the evidence offered by either party. On the hearing, counsel for the respective parties agreed that all the evidence so offered, on either side, should be read, sub

ject to the objections by either party, on the ground of incompetency or irrelevancy, and the same was read accordingly.

"Respectfully submitted.

"R. A. HARRISON, *Special Master.*"

Several exceptions were taken by the defendants to the report, amounting in substance to this, that the findings of fact were not supported by the evidence, and that the findings of law were not warranted by the law as applied to the evidence.

On the hearing the court treated the report as merely presenting the testimony in the case, holding that the findings of the master were not entitled to consideration as presumptively correct, so as to throw the burden of proof on the excepting parties. The language of the presiding justice on this head was as follows:

"A question is made as to the legal effect to be given to the findings of fact reported by the special master, it being claimed by counsel for complainant that the presumption in favor of their correctness throws upon the defendants excepting the burden of proof, which otherwise would have to be borne by the complainant. Undoubtedly, in equity causes, where a particular matter, properly referable to a master, has been reported on, the burden is upon the party excepting; but that rule is not applicable to the present case, where the whole cause has been referred, a practice not borrowed from the Code of Procedure of the State, and not sanctioned by the rules prescribed for the courts of the United States sitting in equity. The cause comes before me, as in other cases, for final hearing upon the pleadings and proofs, and, while not conceding to the report of the special master the legal effect claimed for it, it has, nevertheless, in forming the conclusions reached in this decision, had accorded to it that weight which is due to the careful and well-considered opinion of a lawyer chosen by the parties to act as judge, with every qualification to justify the selection."

The court held that the purchase by the defendant, Charles D. Arms, of the shares in the Grand Central Mining Company

was made on his individual account, and not for the firm of Arms &. Kimberly, and therefore that the equity of the case was with the defendants. It accordingly entered a decree sustaining the exceptions to the master's report, and setting aside the report and findings and dismissing the bill. The case is here on appeal from this decree.

*Mr. Samuel Griffith* and *Mr. A. W. Jones* for appellant.

*Mr. Thomas W. Sanderson* and *Mr. Stevenson Burke* for appellees. *Mr. W. B. Saunders* was with them on the brief.

MR. JUSTICE FIELD, after stating the case, delivered the opinion of the court.

The first question to be considered on the appeal relates to the effect to be given to the findings of fact and of law contained in the report of the special master. The court below refused to treat them as presumptively correct, so as to impose upon the excepting parties the burden of showing error in them. It considered the case as presented on the pleadings and proofs, without reference to the report, to which there was accorded only the weight due to the careful and well considered opinion of a lawyer chosen by the parties to act as a judge, with qualifications to justify the selection. What that weight was, and in what appreciable way it could affect the judgment of the court, does not appear.

A master in chancery is an officer appointed by the court to assist it in various proceedings incidental to the progress of a cause before it, and is usually employed to take and state accounts, to take and report testimony, and to perform such duties as require computation of interest, the value of annuities, the amount of damages in particular cases, the auditing and ascertaining of liens upon property involved, and similar services. The information which he may communicate by his findings in such cases, upon the evidence presented to him, is merely advisory to the court, which it may accept and act upon or disregard in whole or in part, according to its own judgment as to the weight of the evidence. *Basey* v. *Gallagher*,

20 Wall, 670, 680; *Quinby* v. *Conlan*, 104 U. S. 420, 424. In practice it is not usual for the court to reject the report of a master, with his findings upon the matter referred to him, unless exceptions are taken to them and brought to its attention, and, upon examination, the findings are found unsupported or defective in some essential particular. *Medsker* v. *Bonebrake*, 108 U. S. 66; *Tilghman* v. *Proctor*, 125 U. S. 136, 149; *Callaghan* v. *Myers*, 128 U. S. 617, 666. It is not within the general province of a master to pass upon all the issues in an equity case, nor is it competent for the court to refer the entire decision of a case to him without the consent of the parties. It cannot, of its own motion, or upon the request of one party, abdicate its duty to determine by its own judgment the controversy presented, and devolve that duty upon any of its officers. But when the parties consent to the reference of a case to a master or other officer to hear and decide all the issues therein, and report his findings, both of fact and of law, and such reference is entered as a rule of the court, the master is clothed with very different powers from those which he exercises upon ordinary references, without such consent; and his determinations are not subject to be set aside and disregarded at the mere discretion of the court. A reference by consent of parties, of an entire case for the determination of all its issues, though not strictly a submission of the controversy to arbitration — a proceeding which is governed by special rules — is a submission of the controversy to a tribunal of the parties' own selection, to be governed in its conduct by the ordinary rules applicable to the administration of justice in tribunals established by law. Its findings, like those of an independent tribunal, are to be taken as presumptively correct, subject, indeed, to be reviewed under the reservation contained in the consent and order of the court, when there has been manifest error in the consideration given to the evidence, or in the application of the law, but not otherwise.

The reference of a whole case to a master, as here, has become in late years a matter of more common occurrence than formerly, though it has always been within the power of a court of chancery with the consent of parties, to order such

a reference. *Haggett* v. *Welsh*, 1 Sim. 134 ; *Dowse* v. *Coxe*, 3 Bing. 20 ; *Prior* v. *Hembrow*, 8 M. & W. 873. The power is incident to all courts of superior jurisdiction. *Newcomb* v. *Wood*, 97 U. S. 581, 583. By statute in nearly every State, provision has been made for such references of controversies at law. And there is nothing in the nature of the proceeding, or in the organization of a court of equity, which should preclude a resort to it in controversies involving equitable considerations.

By the consent in the case at bar it was intended that the master should exercise power beyond that of a reporter of the testimony. If there had been such a limitation of his authority, there would have been no purpose in adding to his power " to hear the evidence " the power to " decide all the issues between the parties and make his report to the court, separately stating his findings of law and of fact " together with the evidence. To disregard the findings and treat the report as a mere presentation of the testimony is to defeat, as we conceive, the purpose of the reference and disregard the express stipulation of the parties. We are, therefore, constrained to hold that the learned court below failed to give to the findings of the master the weight to which they were entitled, and that they should have been treated as so far correct and binding as not to be disturbed, unless clearly in conflict with the weight of the evidence upon which they were made. That there was no such conflict is manifest. Upon nearly every important particular relating to the partnership between Arms and Kimberly, and its business, there is hardly any discrepancy in the testimony of the parties. It is only as to the circumstances under which Arms obtained his loan from Fairbank, with which he purchased the shares in the Grand Central Mining Company, that there is any serious dispute ; and as that transaction is viewed — as the act of a partner or agent of the firm, or as the act of the individual without regard to such partnership — the conclusion is reached as to his liability to account for them. If the findings are taken as correct — there not being sufficient evidence to justify a disregard of them — there is an end to the controversy, for in accordance with them the firm had an interest in the shares

purchased, and the complainant an equitable right to his proportion upon its dissolution.

But, independently of the findings, the facts, which are undisputed or sustained by a great preponderance of evidence, must, we think, lead to the same conclusion. As already stated, Arms made two visits to Arizona on the business of the partnership, which consisted principally in the purchase and sale of mining properties, and whilst there on both occasions he visited and examined the Grand Central Mine, taking long trips for that purpose, accompanied on one of them by an experienced expert, and thus ascertained the great value of the property. The expenses incurred for himself on both trips and for the expert were charged to and paid by the firm. On one of these visits he met Gage and Witherell, who held certain shares in the company owning that mine, which they desired to sell. Upon his return north, in October, 1879, he informed Kimberly of the shares thus held, and advised their purchase. How the necessary means for that purpose could be raised was then discussed between them, Kimberly expressing a willingness to act upon the judgment of Arms and furnish his portion of the money. Arms mentioned that he had a friend in Chicago by the name of Fairbank, a man of great wealth, whom he thought he could interest in the purchase and induce to advance the money. After this consultation Arms went to Chicago and there succeeded in making an arrangement with Fairbank, by which the latter was to furnish the money to purchase the shares held by Gage and Witherell. The arrangement provided that from the moneys first received from the sale or operation of the mine Fairbank should be reimbursed his advances, and that the sum or interest remaining should be equally divided; but in case the investment proved a failure, he should be paid one half of his advances. Arms then returned to Youngstown, in Ohio, and, October 13, telegraphed Kimberly, who was at Sharon, in Pennsylvania, inquiring where he could meet him. Kimberly replied that he would leave for Youngstown that afternoon, and did so, joining Arms at that place. Gage had previously been there, and Kimberly, on his arrival, immediately inquired

for him, evidently desirous of seeing him respecting the proposed purchase of shares held by him and Witherell; for it is not suggested that Gage had any other business than the sale of the shares, with either member of the firm. Arms told Kimberly that Gage had left that morning or that day, and then informed him of the arrangement with Fairbank, including the agreement to refund one half the advances in case the investment proved a failure. To this arrangement Kimberly assented. Arms further said that there might be some misunderstanding with Fairbank, and he wished to know if, in that event, Kimberly would raise the necessary funds to make the purchase, mentioning from forty to fifty thousand dollars. Kimberly assured him that he would if Arms thought it advisable, that is, that the property was worth the money. Soon afterwards Arms went to Arizona and purchased from Gage and Witherell 225 shares in the Grand Central Mining Company. They also gave him a bonus of forty additional shares, which they had agreed to do in case the purchase was made. Arms also effected a purchase of 74 shares from other parties. All these purchases were made whilst the partnership between Arms and Kimberly continued as originally formed, changed only by the increase in its capital. The partnership was not dissolved until March 4, 1880. Under these circumstances, the purchase must be deemed to have been made in the interest of the partnership. One member of a partnership in a particular business cannot secretly engage on his own account in such business and keep his earnings to himself. Such conduct would inevitably lead to gross abuses, tempting one partner to apply to his own use profitable adventures and to turn over to the firm those which were failures. The law exacts good faith and fair dealing between partners, to the exclusion of all arrangements which could possibly affect injuriously the profits of the concern. Arms was not merely a partner of Kimberly; he was the agent of the firm for the transaction of its business, and as such was allowed a salary beyond the interest coming to him as partner. He therefore stood in his relation to Kimberly clothed in some respects with a double trust, both of which imposed upon him the utmost good faith in his dealings, so that he might never

sink the interest of the firm into that of himself alone. Whatever he may have obtained in disregard of such trust, a court of equity will lay hold of and subject to the benefit of the partnership. Neither by open fraud nor concealed deception, nor by any contrivance masking his actual relations to the firm, can a member of it, or an agent of it, be permitted to hold to his own use acquisitions made in disregard of those relations, either as partner or agent. In this statement of their duties we are repeating doctrines of common knowledge, which will be found fully set forth and illustrated in approved treatises on partnerships and agency and in the adjudications of the courts. Thus, in *Mitchell* v. *Reed*, 61 N. Y. 123, to cite one instance, the Court of Appeals of New York held that one member of a partnership could not, during its existence, without the knowledge of his copartners, take a renewal of a lease for his own benefit of premises leased by the firm, upon which it had made valuable improvements and enhanced their rental value, although the term of the renewed lease did not begin until the termination of the partnership. And in giving its decision, the court said: "The relation of partners with each other is one of trust and confidence. Each is general agent of the firm and is bound to act in entire good faith to the other. The functions, rights and duties of partners in a great measure comprehend those both of trustees and agents, and the general rules of law applicable to such characters are applicable to them. Neither partner can, in the business and affairs of the firm, clandestinely stipulate for a private advantage to himself; he can neither sell to nor buy from the firm at a concealed profit for himself. Every advantage which he can obtain in the business of the firm must inure to the benefit of the firm. These principles are elementary." See Story on Part., §§ 174–178; Story on Agency, § 211.

We do not attach any weight, as against the conclusions reached, to the fact that on the 5th of March, 1880, the day following the dissolution of the partnership, in an instrument executed by Arms, agreeing to convey to Kimberly, on demand, the undivided one half interest which he, Arms, had in mining lands or claims, or stocks in mining interests, or

claims in the Territory of Arizona, purchased or located by him prior to January 1st, 1880, he excepted the interest claimed by him in the Grand Central Mining Company, stating that said interest should belong to him absolutely. That instrument was delivered by Arms to Ohl, who kept it in his possession until some time in the following July. It was not shown to Kimberly, nor had he had any knowledge of it until then. So soon as he saw it, after consultation with counsel, he wrote and mailed to Arms a letter under date of July 22, 1880, notifying him that he would not consent to his holding the interest in the Grand Central Mining Company as his own property, and stating that the said interest belonged to them jointly, and that he, Kimberly, would have half of it if he was compelled to obtain it by legal proceedings. Though it is not shown that Arms received the letter, yet, as it was mailed to his post-office address in Youngstown, Ohio, the presumption is that he did receive it. At any rate, Kimberly never in any way assented to the correctness of the statement in the instrument as to Arms' alleged sole interest in the Grand Central Mining Company, but on the contrary repudiated it so soon as it was brought to his knowledge.

The fact that the transaction with Fairbank and the purchase of the shares were made in the name of Arms alone, does not affect the question. All the purchases for Arms and Kimberly were made in his name alone or in that of Ohl. Not one was made in the firm name of Arms & Kimberly. Nor does it make any difference that no money was advanced by Kimberly for the purchase. None was advanced by Arms; the money was raised by a loan which Arms negotiated upon conditions that proved profitable to the lender as well as to himself, and of course to his partner.

The case of *Bissell* v. *Foss,* 114 U. S. 252, does not seem to us to have any bearing on the subject under consideration. There the question was whether a member of a mining partnership, that is, a partnership formed for the development and working of a mine, could acquire the shares of an associate without the knowledge of the other associates and hold them on his own account; and the court held that it was lawful for

him to do so. Mining partnerships or associations, whilst governed by many rules relating to ordinary partnerships, have some rules peculiar to themselves. One of such rules is that a member may convey his interest or shares to another person without dissolving the partnership, and thus bring into it a new member without the consent of his associates; and may purchase interests in the same or in other mines for his own benefit without being required to account to the partnership for the property. *Kahn* v. *Smelting Co.*, 102 U. S. 641.

The partnership between Arms and Kimberly was not a mining partnership, in the proper sense of that term. It was not a partnership for developing and working mines, but for the purchase and sale of minerals and mining lands, and in that respect was subject to the rules governing ordinary trading or commercial partnerships. It can no more be called a mining partnership than a partnership for the purchase of the products of a farm and the lands upon which those products are raised, can be called a partnership to farm the lands.

It follows from the views expressed that the decree of the court below must be

*Reversed, and the clause remanded with directions to confirm the report of the special master, and to take further proceedings not inconsistent with this opinion.*