[No. 476.   January 6, 1892.]

# EDWARD MEDLER, APPELLANT, v. ALBU-QUERQUE HOTEL & OPERA HOUSE COMPANY ET AL., APPELLEES.

CORPORATIONS—SUBSCRIPTION—BILL IN EQUITY—MASTER'S REPORT—
. EXCEPTIONS.—In a suit, by bill in chancery, to subject certain stock subscribed to defendant company to the payment of an execution issued on a judgment against the company, on a return of nulla bona, where the case was referred to a master to take proof and report with his findings thereon, the chancellor, on exceptions made to the master's report, did not err in refusing to give any weight to the findings of the master, but was justified in considering the testimony as though it had been originally heard by himself.

ID.—FINDINGS OF CHANCELLOR—EVIDENCE.—In such case the findings of the chancellor will not be reversed, unless clearly opposed to the evidence.

ID.—ISSUE OF STOCK—FRAUD—EVIDENCE—AMENDMENT.—Where a certain amount of stock was issued, by the directors of a corporation, for a certain sum of money and certain lots of real estate, and the stock so issued was to be taken as fully paid up, and it was contended that the money and lots together were not equal in value to the stock, and that the issuing of the stock as fully paid up was a fraud upon the creditors of the corporation; but there was a diversity of opinion as to the value of the lots, and the testimony did not show such a discrepancy between the value of the lots and the value of the stock as to raise the presumption of fraud in law, and there was no testimony to show fraud in fact, the chancellor did not err in refusing to allow complainant to amend his complaint after the case had been passed upon by the master, even had the request been made in time, a point upon which the court does not pass, as unnecessary to decide.

ID.—SUBSCRIPTION—STOCKHOLDER.—Where a person was granted the privilege of subscribing to the stock of a corporation by conforming to certain preliminary requirements, and absolutely refused to take the stock, though one of the incorporators and vice-president of the corporation, he was not in fact a stockholder.

APPEAL, from a decree in favor of defendant, from the Second Judicial District Court, Bernalillo County. Decree affirmed.

The facts are stated in the opinion of the court.

WILLIAM H. WHITEMAN for appellant.

Every substantial question of fact found by the master, the court below overruled and set aside, and undertook to say upon which side the weight of evidence lay. This is contrary to the rule established by this court. Huntington v. Moore, 1 N. M. 503; Newcomb v. White, 5 N. M. 435. See, also, Izard v. Bodine, 1 Stock. 309; Sinnickson v. Bruere, Id. 659; Merriam v. Baxter, 14 Vt. 514; Adams v. Brown, 7 Cush. 222; Reed v. Reed, 10 Pick. 398–400; Howe v. Russell, 36 Me. 115; McKinney v. Pura, 5 Ind. 422; State v. McIntire, 53 Me. 214; Pierce v. Faunce, Id. 351, Stimpson v. Green, 13 Allen, 326; McDougal v. Dougherty, 11 Ga. 570; McDaniels v. Harbour, 43 Vt. 460; Rowan v. State Bank, 45 Id. 162; White v. Hampton, 10 Iowa, 238; Howard v. Scott, 50 Vt. 48; Richards v. Todd, 127 Mass. 167; Holabird v. Burr, 17 Conn. 563; Ashmead v. Colby, 26 Id. 287; Holmes v. Holmes, 3 C. E. Green (N. J.), 141; National Bank v. Sprague, 8 Id. 83; Tilghman v. Proctor, 125 U. S. 149.

The great difference existing between the value the expert witnesses placed upon the property justified the court in declaring that as a matter of law the transaction was fraudulent both as against the creditors of the corporation and such stockholders as did not accept the conditions of that order. Cook on Stockholders, 34, et seq.; Boynton v. Andrews, 63 N. Y. 93; Douglass v. Ireland, 73 Id. 100; Osgood v. King, 42 Iowa, 478; Chisholm Bros. v. Forney, 65 Id. 140; Sawyer v. Hoag, 17 Wall. 620; Flinn v. Bagley, 7 Fed. Rep. 785; Ogilvie v. Knox Ins. Co., 22 How. (U. S.) 382.

The principle maintained in the court below is an English doctrine, which has not been favored in the courts of this country, and especially in the federal

courts. Flinn v. Bagley, 7 Fed. Rep. 785; Upton v. Tribilcock, 91 U. S. 45; Hawley v. Upton, 102 Id. 314.

The rule that parol evidence is inadmissible to contradict or vary the terms of a written instrument applies only to the parties to the instrument. Third parties may prove by parol the intention of the parties, and that the writing is contrary to the truth. 1 Greenlf. Ev., sec. 279.

The stockholders, at least, negatively ratified the irregular subscription, if it was irregular, and are estopped from setting up their irregular act to the prejudice of the appellant. Cook on Stockholders, sec. 684, note 4; Supervisors v. Schenck, 5 Wall. 782; Chubb v. Upton, 95 U. S. 667; National Bank v. Graham, 100 U. S. 701; Kent v. Quicksilver M. Co., 78 N. Y. 159–187; Miners Ditch Co. v. Tellerback, 37 Cal. 587.

Section 201, Compiled Laws, 1884, prescribes the manner in which stock may be canceled for unpaid subscription or assessment. Or the company might have sued in assumpsit at common law for the amount of the subscription. Cook on Stockholders, 121, et. seq.

A subscription made to the capital stock of a corporation can not be withdrawn, waived, or canceled, even by the unanimous consent of the stockholders to the prejudice of a creditor. Cook on Stockholders, 168, et seq.; Burke v. Smith, 16 Wall. 390; Sawyer v. Hoag, 17 Wall. 620.

It is well settled that the acceptance by a creditor of a note for a prior existing indebtedness is not a novation of the debt, unless so accepted by the creditor. Bouv. Law. Dict., 247; Peter v. Beverly, 10 Pet. 567.

Facts having been developed on the trial, which were material to appellant's cause, and of which he

had no knowledge when his bill was filed, he had a right to an order allowing him to amend his bill, and it was error to refuse to allow such amendment. Sec. 1911, Comp. Laws, 1884; 1 Danl. Chy. Pl. and Pr. 418; The Tremalo Co. Patent, 23 Wall. 518; Neale v. Neale, 9 Wall. 1; Hardin v. Boyd, 113 U. S. 761.

H. B. FERGUSSON and BERNARD S. RODEY for appellees.

SEEDS, J.—This was a chancery case from the Second judicial district, in which the complainant and appellant, Edward Medler, sues Franz Huning and Frank W. Smith, defendants and appellees, to compel them to pay up their alleged balances due upon stock which it is charged they had subscribed for in the Albuquerque Hotel & Opera House Company, and to make said balances, when so paid, subject to an execution which had been issued upon a judgment rendered in favor of the complainant and against the respondent, the Albuquerque Hotel & Opera House Company; said judgment being rendered for labor performed by the said Medler under a contract to build a hotel for the Albuquerque Hotel & Opera House Company. The hotel had been built in accordance with the contract. A partial settlement had been made with the company, but it had ultimately failed to pay about $4,406.78, for which the judgment, with interest, was rendered for $5,651.25. Execution was issued upon the judgment against the company, and returned nulla bona. The bill sets forth the above facts, and also that the defendants Franz Huning and Frank W. Smith were stockholders in said Albuquerque Hotel & Opera House Company, and had become so by subscription at the organization of the company, about February 8, 1882; that said stock had not been fully paid up; and it prays that the balances due upon said stock from the respondents be decreed to be paid

to the plaintiff upon his judgment against the company. To this bill the respondent Franz Huning demurred, but the demurrer was overruled. Afterward the respondents filed separate answers. The answers raise distinct and different issues in part, and hence the decision will have to be of such a dual character as to distinctly treat all the issues fairly raised, and necessary to a decision. The respondent Frank W. Smith, in his answer, denied all the allegations of the bill; denied that he was ever a stockholder of the company, but he charged the fact to be that he was originally one of the promoters to build a hotel and opera house, and not alone to build a hotel; that after others of the original promoters had gone on to build the hotel alone, "they duly and legally deposed" him from any and all connection with the scheme; that he never was entitled to any stock in said company, and there was never a share of the stock issued to him, and that he never complied with the requirements of law sufficiently to entitle him to any stock, or to make him liable to the creditors of the company. He further charged that the complainant, Medler, was equitably estopped from claiming any liability from him, because he says that the complainant afterward became a stockholder of the company, and as such stockholder participated in meetings which borrowed money to pay the complainant for his contract for building the hotel, and took part in certain meetings wherein the said Smith was discharged, deposed, and forever debarred from having any claim or right in said company. The respondent Franz Huning filed three pleas to the bill, in which, after admitting some of the allegations of the bill and denying others, alleged that, while the capital stock was fixed at $100,000, he denied that it was divided into two thousand shares of $50 each, but charged that it was divided into one thousand shares of $100 each; that, at the time the company became indebted to

Medler, all the stock subscribed by him had been fully paid up; that, while he had originally owned one hundred and forty-two shares of the stock, yet that, prior to the date of the company's becoming indebted to Medler upon the note given him by the company (upon which the judgment had been given in Medler's favor), he (Huning) had returned forty-one of those shares to the company in pursuance of an agreement with Medler by which he was to receive from the company, as part of his contract price, $10,000 of paid up stock, and that Medler took said stock as fully paid up stock, knowing the facts in regard to said stock fully. That the complainant, Medler, when he took the note for his debt, "extended credit alone to the company, knowing at the time the exact state of the subscription lists to said company, at least so far as this defendant was concerned." To the answer of the respondent, Smith, and the pleas of the respondent, Huning, the complainant filed replications, and thereupon the following entry was made of record by the court, sending the matter to a master: "It is also ordered that this cause be referred to N. C. Collier, who is hereby appointed special master herein, to take proofs, and report the same with his findings thereon, with all convenient speed."

In accordance with the order the master proceeded to take proofs and reported the same with his findings. He found substantially as follows: (1) That the Albuquerque Hotel & Opera House Company was duly incorporated February 11, 1882, to build an opera house and hotel, either together or separately; that the capital stock was $100,000, divided into two thousand shares of $50 each; that the respondents, Huning and Smith, were among the incorporators, and were named as two of the directors. (2) That upon February 25, 1882, at a meeting of the stockholders, at which Huning was present, he was elected

president, and the respondent, Smith, was elected
vice-president.   The secretary was authorized to open
books for stock subscription.   (3) That between Feb-
ruary 25, 1882, and July 10, 1882, the said respondents,
Huning and Smith, with others, signed for one hun-
dred and forty-two shares each, "to be issued under
the charter and by-laws of said company, of the par
value of one hundred dollars each."   (4) That on
March 30, 1882, the respondents, Huning and Smith,
as directors, attended a meeting of said board of
directors, and authorized the incurring of liabilities by
said company toward the erection of a hotel.   (5) That
July 10, 1882, a stockholders' meeting was held, and
the respondents, Huning and Smith, were elected
directors of said company, and by the directors they
were elected president and vice-president, and so con-
sidered by the company up to the middle of December,
1884.   (6) That subsequent to July 10, 1882, the
respondent, Smith, acted as director, by giving direc-
tions about the building of the foundation for the hotel,
and sometimes consulted with other directors as to the
progress of the scheme to build a hotel, but did not
attend a meeting of said board after March 30, 1882.
(7) That the arrangement by which the stockholders
turned over certain land held by them, in the imme-
diate vicinity of the hotel, together with $9,092, in full
payment of their stock, was in law a fraud and failed
to make such full payment, although there was no
question of the good faith of the parties as a matter of
fact.   (8) That there was no evidence that Smith had
legally ever been deposed from the company. (9) That
the complainant was at no time prior to the institution
of this suit aware of the claim by the respondent,
Smith, that he was not a stockholder in the company.
(10) That no certificate of stock was ever issued to
the respondent, Smith, as he had never paid for it,

nor was that number of shares ever issued to anyone else. (11) He found the other facts for the complainant, and recommended a decree against both defendants, and in favor of the complainant. Exceptions were taken to the report by both complainant and respondents, which were duly argued to the chancellor, who, upon hearing the same, gave a decree in favor of the respondents, and dismissed the bill. The complainant appeals.

The complainant and appellant makes sixteen assignments of error, which, for the purposes of this opinion, may be conveniently reduced to the following: (1) In disregarding and setting aside the finding of facts by the master. (2) In finding that the stock subscription paper was prepared and signed before the filing of the articles of incorporation with the secretary of the territory. (3) In finding that there was no subscription list. (4) In finding that the only subscription by the defendant Huning was that embraced in the order of the directors made March 22, 1883, wherein the directors purported to issue nine hundred and ninety-eight shares to various persons therein named for a certain cash payment, together with certain real estate, and declaring the shares thereby fully paid up and nonassessable. By this order the defendant Smith was entitled to one hundred and forty-two shares, if he would come in and pay his cost proportion. (5) In finding that the defendant Smith's subscription to the stock had been canceled by the mutual consent of all the parties. (6) In finding that the defendant Smith had been removed from the office of vice-president because he had refused to take his stock, and this was long before the complainant's contract with the company. (7) In finding that the arrangement whereby the stock was declared fully paid up and nonassessable was a fair arrangement, not to be set aside for overvaluation, unless it was proven that such

overvaluation was intentional and fraudulent. (8) In finding that the complainant was cognizant of the condition of the stock; that it was fully paid up; and that he himself held $10,000 of said stock with said knowledge, and was a stockholder, with full knowledge of the affairs of the company, at the date of his contract with the company. These findings of the chancellor were made upon the hearing of the exceptions to the report of the master, and in each finding they were diametrically opposite to the findings of the master. The exceptions to the report were full and explicit.

The first question raised by the exceptions is this: Under what circumstances may the chancellor, upon the hearing of exceptions to the report of a master, set aside the findings of the master as to matters of fact? The complainant contends that, as the case has been referred to the master to hear the evidence, and report the same to the court, with his findings, the chancellor can not set aside the findings of facts unless it clearly appears that he has made a mistake, or has acted corruptly, or has made an erroneous application of the law to the facts. Among others, he cites two cases from this court (Newcomb v. White, 5 N. M. 435, and Huntington v. Moore, 1 N. M. 489) which it is insisted are decisive of this question. However, it is quite apparent that these cases are not in point. They simply hold that in the supreme court the report of a master upon matters of fact has the weight therein attached to them. In each of those cases, too, the exceptions made to the findings at the hearing before the master, and made to his report, were heard by the chancellor, and overruled, so that there was no question of conflict between the master and the chancellor upon the facts brought to the attention of the court. It is very clear that in the supreme court the rule is that "in dealing with these exceptions"—that is, the exceptions taken

BILL in equity: master's report: exceptions: findings.

to the master's report—"the conclusions of the master, depending upon the weighing of conflicting testimony, have every reasonable presumption in their favor, and are not to be set aside or modified unless there clearly appears to have been error or mistake on his part." Tilghman v. Proctor, 125 U. S. 136, 149; Callaghan v. Myers, 128 U. S. 617, 666; Richards v. Todd, 127 Mass. 167, 172; Howe v. Russell, 36 Minn. 115; Pierce v. Faunce, 53 Minn. 351; Newcomb v. White, 5 N. M. 435; Huntington v. Moore, 1 N. M. 489, 503.

But in this case it is insisted that the chancellor, upon the hearing of the exceptions to the report of the master, is bound by the same rule as in the supreme court, and that, as it did not clearly appear that the master had made an error or mistake, it was error for him to set aside the findings upon his mere judgment of the weight of the testimony. This question has never been decided in this court. It has been decided both ways by different courts. Daniel in his work upon Chancery Practice, in treating of the practice in regard to master's reports, says: "After this report was made the cause came again before the court for a final settlement. * * * The parties might, however, by excepting to the report, appeal to the court against the decision of the master, and reopen all the questions that had been decided." Daniel Ch. Pr. & Pl. 1322. This is undoubtedly good law, but it is quite evident that it does not throw any light upon the question here raised, which is, should the chancellor reverse the findings of the master upon matters of fact merely upon his judgment of the weight of the evidence, or only when the master has clearly made an error or mistake? In the case of Bridges v. Sheldon, 7 Fed. Rep. 17, 37, WHEELER, D. J., who was the chancellor, says: "The power of the court to set aside a report of the master is unquestioned; but it is not to be exercised capriciously

or otherwise, but for good cause, and mere differences of opinion as to the weight of evidence, when they exist, do not constitute good cause." Also, In re Murray, 13 Fed. Rep. 550; Sinnickson v. Bruere, Stock. Chancery (N. J.), 659; Izard v. Bodine, Id. 309; Howard v. Scott, 50 Vt. 48; McDaniels v. Harbour, 43 Vt. 460. In the case of Izard v. Bodine, supra, the chancellor says: "Where a matter of fact has been referred to a master, depending upon the testimony of witnesses conflicting in their opinion, and differing in their recollections of past events, the decision of the master ought not to be interferred with on his mere judgment of the facts, unless it is a very plain case of error or mistake." These cases in a greater or less degree hold, practically, that the same rule obtains in the proceedings before the chancellor as in those which are before the supreme court. On the other hand, in the case of Near v. Lowe, 23 N. W. Rep. (Mich.) 448, Judge COOLEY says: "Complainant raises certain legal questions: First, he insists that the report of the commissioner, like that of a referee at law, should be held a conclusive finding upon the facts, so far as it appeared there was any evidence to support it. But this is not the rule in equity. The judge must decide upon the facts on exceptions, according to his own view of what is established by proofs." Also, Holmes v. Holmes, 3 C. E. Green, 141; Kimberly v. Arms, 129 U. S. 512, 522. The last case cited would seem to carry out the idea that, while generally the rule is as stated by Judge COOLEY, yet in practice the chancellor will not arbitrarily take upon himself the duty of ignoring the report of the master, and passing upon the facts solely from the proofs introduced; for Judge BREWER said: "In practice it is not usual for the court to reject the report of a master, with his findings upon the matter referred to him, unless exceptions are taken to them, and brought to his attention, and upon exam-

ination the findings are found unsupported, or defective in some essential particular." However, the effect of this decision is practically that in the case of the usual reference of a matter to a master to take testimony and report the same, or to find upon a particular issue, as an account, the report of the master is simply advisory; and while it is true that, in the absence of exceptions to the report, the chancellor will not usually set the report aside upon his own motion, yet, when there are exceptions to the report, he may refuse to consider the findings of fact by the master, and himself inquire into the weight of the testimony adduced, as well as into errors of law or mistakes as to the facts, and upon that weight solely make his findings for the purpose of a decree.    Under the case of Kimberly v. Arms, supra, there arises another question, which might possibly be applicable here.    In it the court says: "It is not within the general province of a master to pass upon all the issues in an equity case, nor is it competent for the court to refer the entire decision of a case to him without the consent of the parties." And, when such a reference is made, then the findings of the master are to be considered as so far binding upon the chancellor as not to be disturbed unless clearly in conflict with the weight of the evidence upon which they were made; and they decided in this case that the chancellor had failed to give the findings of the master the weight they were entitled to.    129 U. S. 512, 525.    In the case before us the order of reference does not say that it was by consent of parties.    But as the record shows that the master did hear all the evidence, that he passed upon all the issues, and reported his findings both as to the facts and the law, and that there were no exceptions to such action by him, and the case of Kimberly v. Arms, supra, holds that a chancellor can not make such a reference without the consent of parties, the writer of this opinion conceives that it must be pre-

sumed that as a fact this reference was the same as
that in the cited case, and that the findings of the mas-
ter are entitled to the weight therein given them.
However, the majority of the court do not so interpret
the case before us, but consider it simply as a partial
reference under the powers of the chancellor, and, as
such, that the findings of facts of the master can be
measured, if necessary, solely by an inquiry into the
weight of the evidence. That being the law in this
territory, it is plain that the chancellor in the lower
court committed no error in refusing to give any
weight to the findings of facts by the master, but was
justified in considering the testimony as though it was
originally heard by himself.

1.   The question is now presented, however, what,
if any, weight is to be given the findings of the master
as to facts when the chancellor has found differently
than he had? It would seem inevitable from the fore-
going holding that the findings of the master must in
such a case be entirely repudiated, and that we can
only consider the testimony and the findings, if any,
of the chancellor. But what weight is to be given the
findings of the chancellor? The reason usually ad-
vanced for giving so much weight to the findings of a
master—that he heard the witnesses, and beheld their
demeanor upon the stand—does not apply to the case
of the chancellor. Why, then, should any weight be
given to his determination? Ought not this court,
having all the evidence before it, as did the chancellor,
pass upon it, unbiased by any presumptions or weight
growing out of the chancellor's findings? The court
think not, but consider that we should give some
weight to the findings of the chancellor, and not
reverse those findings unless clearly opposed to the
evidence.

2.   Was the stock subscription made before or
after the organization of the company? It had no

date to it. The records of the company were very
loosely and carelessly kept. The secretary inferred
from certain data that it was made after the organiza-
tion, but the exact date he could not say. He testifies
positively that there had been one subscription started
with the object of enlisting a large number of sub-
scribers, but that it failed, and that afterward the
stock subscription in question was made. But he fails
in this evidence to say whether this was after the incor-
poration of the company or not. Upon the other
hand, defendant Smith and the witness Wilson, who
was a director and the treasurer of the company, both
testify that the stock subscription in evidence was
made as a preliminary effort to see what could be done
in the way of starting the scheme afterward carried out.
The testimony would lead one to believe that there
were three subscriptions. There is much in the conten-
tion of the complainant that the order made after the
incorporation of the company at one of the director's
meetings, instructing the secretary to open stock
books; the facts that the subscription was made in the
secretary's book; that the company held stockholders'
meetings, which could hardly have been done if there
had been no stockholders,—all point to the fact that
the stock subscription was made after the organization
of the company. But, as there is much confusion in
the testimony, if not contradiction, and as it can not
be said that the finding of the chancellor was clearly
opposed to the testimony, we will have to hold that
there was no error in the finding.

3. If the above finding was correct, then, evi-
dently, the shares in this company were ascertained
and subscribed for either by the subscrip-
tion made before the organization, or by
the resolution adopted by the directors up-
on March 22, 1883, whereby the directors issued a cer-
tain amount of stock to various persons for $9,092 and

ISSUE of stock:
  fraud: evidence:
  amendment.

twenty-eight lots of real estate, and the stock so issued was to be taken as fully paid up. The defendant Huning received one hundred and forty-two shares; and the same number was allotted to the defendant Smith upon the condition that he paid his share of the cash already put into the hotel undertaking, and the real estate. The chancellor finds that this is the only subscription ever made. This finding must be held, under the rule above adopted, as correct. But the complainant contends that as the lots, together with the $9,092, were only worth, at a fair and just valuation, not over fifty or sixty thousand dollars, that the issuing the stock as fully paid up was a fraud upon the creditors of the company. It is well settled in this country that the capital of a company is a trust fund for the benefit of creditors, and that an intentional overvaluation of property given for stock is such a fraud upon creditors as to give them the right to proceed against the holders of such stock for contribution of such amounts as will make the difference between a fair and just value of the property and the par value of the stock so issued. Cook, Stocks, sec. 34, et seq.; Douglass v. Ireland, 73 N. Y. 100; Sawyer v. Hoag, 17 Wall. 620; Upton v. Tribilcock, 91 U. S. 45. But there must be the intention upon the part of the parties to overvalue the property, which intention makes it fraudulent. Now in this case there is no evidence of such an intention. The master found distinctly that there was no such intention. The claimant insists, though, that the overvaluation was so great that apart from actual intention, and in law, it must be considered as a fraud of which creditors may take advantage. It is undoubtedly true that there could be such a condition of facts as would require a court so to hold. Chisholm Bros. v. Forny, 65 Iowa, 333. But in this case there was a diversity of opinion as to the value of the real estate turned in upon the stock issue; and we

think that, apart from the weight to be given the chancellor's finding, the testimony came far from showing that there was such a discrepancy between the value of the real estate and the value of the stock as to raise the presumption of fraud in law, and none whatever to show fraud in fact.

4. As, upon the facts in evidence, there was nothing to charge the defendants with fraud, there could have been no error in the chancellor's refusing the complainant the privilege of amending his complaint after the case had been passed upon by the master, even had the request come in time, which point it is unnecessary to decide. As, then, the defendant Huning had fully paid up his stock, the appellant could have no claim against him.

5. The complainant insists, even though the defendant Smith did not sign the subscription for stock after the organization of the company, SUBSCRIPTION: stockholder. that, as he subscribed for stock in a company which was afterward incorporated, and as he was one of the incorporators, and attended at least one of its meetings, being its vice-president, he was thereby recognized as a member of the company, and he recognized his obligation to take the stock originally subscribed for. That one can thus obligate himself to take stock subscribed for before the organization of the company is now settled law. Cross v. Pinckneyville Mill Co., 17 Ill. 54; Buffalo v. Jamestown Railroad Co., 87 N. Y. 294. And, when the interest of creditors of the company is at stake, courts will scrutinize very carefully indeed any defense which endeavors to evade the responsibilities of such a subscription. If, then, the subscription to the stock in question was acted upon by the company afterward, certainly this defendant was in law a stockholder in this company. It is true that he claims that he withdrew from the company in a legal manner before the company be-

came in any way obligated to the complainant herein. We think that the proof shows this. But, in our view of the case, this makes no difference; for, if the finding of fact by the chancellor is correct, as above stated, —that the only issue of stock made by this company was that made March 22, 1883, wherein this defendant was granted the privilege of taking stock by conforming to certain preliminary requisites,—and as he failed and absolutely refused to take such stock, it is apparent that he was in fact never a stockholder in the company. This is the necessary consequence of the holding by the chancellor. It unquestionably leaves much of the evidence in an unsatisfactory condition. But that is invariably the case where the evidence is conflicting. We find no errors calling for a reversal of the case. The decree of the lower court is affirmed.

O'BRIEN, C. J., and FREEMAN and MCFIE, JJ., concur. LEE, J., did not sit in this case.