## BALTIC COTTON CO. v. UNITED STATES.

### No. 6373.

Circuit Court of Appeals, Fifth Circuit.

Feb. 5, 1932.

Harry T. Smith & Caffey, of Mobile, Ala., for appellant.

Alexander C. Birch, U. S. Atty., and Wm. B. Inge, both of Mobile, Ala., for the United States.

Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.

SIBLEY, Circuit Judge.

Baltic Cotton Company brought a libel under 46 USCA § 742, against the United States as owner and operator of the steam-

ship Hastings, for that the ship had falsely stated in its bill of lading for three hundred bales of cotton shipped from Mobile by Weil Brothers to themselves at Copenhagen with order to notify Baltic Cotton Company, that the cotton was in apparent good order and condition, knowing the fact to be otherwise, and that libelant had paid value for the bill of lading and cotton relying on the statement, and had been injured through the cotton proving to have been wet when shipped and badly damaged in consequence. The District Judge heard the evidence, including the oral testimony of three important witnesses, Leonel Weil, one of the shippers, Rayford, the shipper's agent at Mobile, and Sadler, the port inspector. He decreed liability, but being dissatisfied at the uncertainty of the evidence touching the amount of damage, referred that question to a commissioner to report his findings and recommendations to the court. The commissioner six months later heard the case upon the report of the evidence taken before the judge, no further evidence of importance being offered before him, and reported damages of $7,945.77 based upon an estimate made in Copenhagen soon after the arrival of the cotton by surveyors appointed by the Sea and Commerce Court there. On exception the judge set aside the commissioner's conclusions and made a decree for $1,831.83. 50 F.(2d) 257. The Baltic Cotton Company appeals.

■■■■ It is undisputed that the bill of lading affirmatively represented the cotton as received in good order and condition although its recent wetting was known, being thus issued on the promise of Rayford to indemnify the ship, and that appellant paid the attached draft for the purchase price of the cotton on the faith of the representation. Appellee's liability for the resulting loss is established. Higgins v. Angelo-Algerian S. S. Co. (C. C. A.) 248 F. 386; Oliver Straw Goods Corporation v. Osaka (C. C. A.) 27 F.(2d) 129; see also Austin, Nichols & Co. v. Isla De Panay, 267 U. S. 260, 45 S. Ct. 269, 69 L. Ed. 603. It is asserted that the commissioner's report of the amount of damage could not be set aside by the judge because supported by some of the conflicting evidence, and reliance is put upon Davis v. Schwartz, 155 U. S. 631, 15 S. Ct. 237, 39 L. Ed. 289. A Commissioner in Admiralty resembles a Master in Chancery. Admiralty Rule 43 (28 USCA § 723); Marquest v. Grant (C. C. A.) 83 F. 519. But the reference in Davis v. Schwartz as in Kimberly v. Arms, 129 U. S.

512, 9 S. Ct. 355, 32 L. Ed. 764, which it follows, was of the entire case and by consent of the parties. The rule there announced is not applicable to a partial reference without consent to make an accounting or to fix damages. The distinction is plainly pointed out in Kimberly v. Arms. Nor is this case like Medsker v. Bonebrake, 108 U. S. 67, 2 S. Ct. 351, 27 L. Ed. 654, where the master heard and saw the witnesses testify, and thus had a better opportunity than the judge to estimate their credibility. The reverse is true here. The power given this commissioner was to report his recommendations to the court. The court was not bound to follow them. The Spica (C. C. A.) 289 F. 436. The case comes to us to review the conclusion of a judge who did see and hear the witnesses who testified orally, and on whose testimony he largely placed his judgment.

The important facts are these: Three one-hundred bale lots of cotton aggregating 152,000 pounds of uniform grade and price were sold by Weil Brothers, of Montgomery, to Baltic Cotton Company, and were shipped by river steamer to Mobile, Ala. There the port inspector, Sadler, found the bales wet on the ends and one lot very wet. Rayford, the local agent of Weil Brothers, cut the bagging open on the wet ends and undertook for several days to dry them by sun and air, afterwards sewing the bagging up again. Bill of lading was given on January 28, 1925. On arrival at Copenhagen March 12, 1925, the cotton was weighed out and put in the warehouse of Baltic Cotton Company without exceptions, but on March 16th damage underneath the bagging was found and claim made by Baltic Cotton Company against its marine insurers. Baltic Cotton Company without notice to the ship or shippers applied to the local Sea and Commerce Court for a survey of the damage and surveyors were appointed. The survey was made on March 19th and 20th, and damage reported of 27 per cent. to one lot, 9.7 per cent. to another, and 6.8 per cent. to the third lot. Chemical analysis showed the damage not to be due to sea water, but to wetness before shipment. Baltic Cotton Company on March 21st cabled Weil Brothers these facts, and suggested reassessment of the damage by Lloyd's agents. Weil Brothers, not knowing of Rayford's oral promise to the ship, replied that the cotton was inspected by maritime inspectors before loading and the steamer had issued clear bill of lading and insurers were responsible. Baltic Cotton Company within fourteen days after March 21st

completed the picking and reconditioning of the three hundred bales, and later sold them to their customers, who have never made any complaint. On April 17, 1925, Weil Brothers advised Baltic Cotton Company that Leonel Weil was coming to Europe and would take up with them the settlement of the dispute, concluding with the request: "We should also like for you to see that the damaged pickings are kept in good condition." In answer Baltic Cotton Company wrote on May 7th: "According to your wishes we are keeping a large sample of the pickings at Mr. Leonel Weil's disposal on his arrival." Weil came and examined the sample, considered the damage to be much less than claimed, but offered to pay the actual loss less the value of the damaged cotton. Baltic Cotton Company offered no proof of their actual loss except the survey, which Weil refused to recognize. They claimed the pickings had been thrown away. Litigation followed. Weil Brothers learned of and ratified Rayford's assurance to the ship, and are the virtual litigants on that side of the case.

 The Baltic Cotton Company upon whom the burden rests to prove their loss have offered nothing except the testimony of the two Danish surveyors. Every damaged bale was picked and reconditioned in their warehouse by three of their employes, working fourteen days. Both the pickings and the remaining sound cotton could have been weighed. The sound cotton had to be weighed when resold. Its weight, subtracted from that of the original bales, would have given the weight of the pickings. The loss in value of the pickings plus the cost of picking would accurately measure the loss, and nothing else would. Knowing at the time that a dispute was pending with Weil Brothers, Baltic Cotton Company by answers to interrogatories say that the pickings, although the most reliable evidence both of their quantity and their quality, were thrown away, and that no account was kept or attempted to be kept of the identity or weight of the sound cotton from which the weight of the damaged cotton could be ascertained. Both of the Danish surveyors testify that the marks on the bales remained unaltered by them, and one of them testified that cotton is handled in Denmark as it is throughout the world, and that it is customary when original cotton is sold for the seller to make out an invoice showing the weight and marks of the bales. Appellant's own accountant testified that as a rule the Baltic Cotton Company made a record of the weight, mark, date of receipt, and shipper of each bale as received, and made a similar record of each bale when sold. The appellee through interrogatories sought to compel the furnishing by appellant of such records for this cotton, and the names of the customers who bought it. The first answers were held by the court to be evasive and insufficient, whereupon the appellant claimed that the identity of the bales was wholly lost after reconditioning, and they could not trace them on their records so as to give their weight or to say who bought them. If in reconditioning some of the badly damaged bales were combined together, the identity of the reconditioned bales could nevertheless easily have been and regularly would be preserved, especially in the face of a dispute about them. We must consider this failure in connection with the destruction of the pickings as amounting under the circumstances to a willful suppression of the most reliable evidence in the case, from which adverse inferences as to the correctness of the survey may and ought to be drawn. As to the sample which was kept, the evidence is directly conflicting. The appellant's officer, answering an interrogatory, swears: "We kept a large sample of the pickings for Mr. Weil's inspection. It represented the true average of the pickings. It was a reddish cake of cotton reduced to tinder by the rotting process through which the cotton had passed and was of no commercial value whatsoever. There was no white cotton contained in same." Weil swears: "In the sample they showed me there was only a skin of tinted cotton not an inch thick. The balance of it was perfectly sound white cotton. I pulled the staples in it, and more than half of that sample was perfectly good cotton and the other half damaged cotton. I pulled the staple in it to show them how sound it was." He valued it at 15 to 18 cents per pound. The sale price of the sound cotton was 25.90 cents. The two surveyors testified more than three years after their survey in identical and somewhat remarkable expressions to extensive damage. The testimony both of Weil's agent and the inspector at the port of Mobile is that the cotton was freshly wet and was not substantially damaged when loaded January 28th. If not dried out, as Rayford claims it was, it is unlikely that by March 12th, forty-three days, the cotton would be wholly rotted, nor is it likely that cotton rotted by absorbed moisture would be separated from the sound cotton by a line so distinct that the bale would contain only completely sound and completely rotten cot-

ton. Bales so thoroughly picked as to leave only perfectly sound cotton must have produced some pickings of some value. As to the weight of the damaged cotton, the appellant relies wholly on the survey. It appears that in making it the bales were separated according to outside appearance into six or seven lots and about one-third of each lot were opened and picked and the pickings and remaining cotton weighed. None of the weights are disclosed, but the surveyors each state that they estimated that on one lot of one hundred bales the damage was 27 per cent., on another lot 9.7 per cent., and on the third 6.8 per cent. From the testimony of the inspector at Mobile and of Rayford it appears that the bales had stood on end recently in shallow water, the depth to which the moisture had then penetrated being shown by a water mark around the end of the bale when opened from 1 to 1½ inches up. This wetness is not itself a damage, but will result in damage if not dried out. Rayford testifies that he dried out the wet ends almost completely. It is certain that no new wetting occurred. The judge, thinking that the moisture then in the bales could not have penetrated much further, allowed a depth of 2⅛ inches of average total damage, being 4 per cent. of the bale of average height of 53 inches, instead of the much higher estimate made in Copenhagen. By the conduct of the appellant exact evidence of the true damage though at first in their power cannot now be had, and estimates must in consequence be resorted to. We see no such clear error in the conclusion reached by the District Judge as to require us to make another guess.

Judgment affirmed.