## In re SENOIA DUCK MILLS.

### (District Court, N. D. Georgia. February 2, 1912.)

### No. 2,936.

1. BANKRUPTCY (§ 98*)—PETITION—DENIAL—SUBMISSION TO SPECIAL MASTER —EFFECT.

Where issues raised on an answer to a bankruptcy petition were submitted to a special master for hearing and determination of both matters of fact and law, and such reference is entered as a rule of court, it constitutes a submission of the controversy to a special tribunal, selected by the parties, to be governed in its conduct by the ordinary rules applicable to the administration of justice in tribunals established by law, so that the master's report may not be set aside and disregarded at the discretion of the court.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 98.*]

2. EQUITY (§ 409*)—SUBMISSION TO SPECIAL MASTER—FINDING.

Where a case is submitted to a special master to report the evidence and his conclusions of law, there is a presumption of correctness as to his finding of facts similar to that in the case of a finding by a referee, the special verdict of a jury, or the findings of a Circuit Court in a case tried by the court without a jury.

[Ed. Note.—For other cases, see Equity, Dec. Dig. § 409.*]

3. CORPORATIONS (§ 428*)—KNOWLEDGE OF OFFICERS—EFFECT ON CORPORATION.

Where the vice president of the alleged bankrupt corporation was not only acting for the corporation, but also for himself, in a matter with relation to the transfer of certain machinery to it in which his interest was adverse to that of the corporation, his knowledge of the fact that the purchase price of the machinery, which he and certain others were instrumental in selling to the corporation, had not been fully paid by them, was not binding on the corporation so as to deprive it from occupying a position of a bona fide purchaser for value.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1748–1761; Dec. Dig. § 428.*]

In the matter of bankruptcy proceedings against the Senoia Duck Mills, an alleged bankrupt. An answer denying insolvency or the commission of an act of bankruptcy having been filed, the matter was submitted to a special master. On exceptions to the master's report. Overruled, and report confirmed.

Anderson, Felder, Rountree & Wilson and W. S. Dillon, for excepting creditors.

J. E. & L. F. McClelland, for bankrupt.

NEWMAN, District Judge. A petition in bankruptcy was filed by certain creditors against the Senoia Duck Mills. The Duck Mills filed an answer denying insolvency and the commission of the act of bankruptcy alleged in the petition. By consent of parties there was a reference to a special master of the questions made by the answer of the Duck Mills. The order of reference was as follows:

"The above matter coming on regularly to be heard, and the alleged bankrupt having duly filed his petition to the application in bankruptcy and to the application for a receiver; and it further appearing that a refer-

ence of said matters should be had for the taking of proofs touching the issues made, and to ascertain whether Senoia Duck Mills should be adjudged bankrupt and whether a receiver should be appointed, pending the appointment of a trustee and the determination of the other questions at issue; and it further appearing that all parties to the cause are consenting thereto:

"It is considered, ordered, and decreed that the matters aforesaid, and the cause, be and the same is hereby referred to Clarence Bell, as special master, and he is hereby made special master in said cause and is directed to take proofs and evidence upon all and singular the issues made by the pleadings, and report the same to the court.

"To this end, it is ordered and decreed that said special master shall have all the powers of a master in chancery to acquire the taking of testimony, and if desired, the production of writings and documents, to issue subpœnas and subpœnas duces tecum; and that he be and is hereby authorized to discharge his duties as such special master at any convenient place, or places, as he may determine.

"It is further ordered that in making his report, or reports, to the court, the said special master is to embrace therein the findings, both of fact and of law, so as to comprehend all the issues in the cause and relating to the matters above referred to, whether of fact or of law.

"It is further ordered that the special master be and is hereby empowered to allow amendments to the petition in bankruptcy, as well as amendments to the petition or application for a receiver, and to allow, receive and consider any and all interventions appropriate to the subject-matter of the cause, and within the purview of the bankruptcy act as amended.

"It is further ordered that the moving creditors against the Senoia Duck Mills be and they are hereby given thirty (30) days to introduce their evidence before the master, and the defendant be and is hereby allowed thirty (30) days after completion of the evidence of the moving creditors within which to introduce such evidence as it may desire to offer, and that said moving creditors have thirty (30) days additional time in which to introduce further evidence after the defendant shall have completed the introduction of its evidence, with power and authority to such special master to allow reasonable extensions of time, if necessary and desirable, in the matter of introduction of evidence by either side.

"It is further ordered that the special master shall make his findings of law and fact herein and report the same to the court as expeditiously as possible, in accordance with the rules and practice relating to references in equity.

"Entered in open court this 28th day of April, 1911."

After a hearing there was a report by the special master as follows:

"On April 13, 1911, certain persons, alleging themselves to be creditors of the Senoia Duck Mills, a corporation, resident at Senoia, Coweta county, Ga., filed an involuntary petition in bankruptcy against said corporation, setting out that the said Senoia Duck Mills was insolvent, and that it had committed an act of bankruptcy, and certain other facts usual and necessary in a petition of this character, concluding with a prayer that the Senoia Duck Mills be adjudged a bankrupt within the purview of the bankruptcy act of 1898, as amended. The petitioning creditors were Dunn & Ogletree, a copartnership composed of W. E. Dunn and W. V. Ogletree, C. G. McCraney and W. V. Ogletree, individually.

"To said petition the Senoia Duck Mills (hereinafter referred to as the 'corporation') filed an answer denying all the material allegations of the petition, and denying further that the petitioning creditors as named were bona fide creditors of the corporation. At the time the petition for bankruptcy was filed, the above-named parties also filed an ancillary bill for a receiver, to which the corporation filed an answer denying all the material allegations therein.

"On the 28th of April, 1911, by consent of parties, the case was referred to me as special master, with directions to take the proof and evidence upon

all and singular the issues made by the pleadings, and to report my con-
clusions to the court, and with the further direction that there shall be
embraced in the report the findings both of fact and of law, so as to com-
prehend all the issues in the cause.

"In pursuance of said order, I set the matter down for a hearing, after
notice to all parties, which hearing began May 22, 1911, and continued from
time to time until July 8, 1911, when the hearing of evidence and argu-
ment of counsel were concluded. The testimony taken by me was very volu-
minous, embracing 429 pages, together with a large number of exhibits, and
a mass of documentary evidence.

"In order to understand the issue as made by the pleadings, and as devel-
oped by the testimony, it is necessary to set out briefly the contention of
the parties to this litigation. It will be understood that, generally speak-
ing, the questions to be here determined are:    First, was the corporation
insolvent? and, second, did it commit the act of bankruptcy, as set out in
the petition for adjudication?

## "Contention of Petitioning Creditors.

"It is urged by the moving creditors in this case that the corporation
is indebted to the following persons in the following sums:

| | |
|---|---:|
| A. B. & A. Railroad | $    403 20 |
| Hancock-Holmes Foundry & Machine Works | 268 80 |
| Park A. Dallis | 90 48 |
| Dunn & Ogletree | 302 51 |
| C. G. McCraney | 899 97 |
| W. V. Ogletree | 50 00 |
| W. D. Beyer | 500 00 |
| Bank of Senoia | 9,257 22 |
| Total | $11,772 18 |

"They further contend that the corporation has practically no assets, that
it does not own the land upon which the plant of the company is erected,
that the title to the machinery installed in the plant is not in the corpora-
tion, but is in Mr. George P. Howard, of Atlanta, Ga., and that, in fact,
the only assets that the corporation has is a small sum of money in the
Bank of Senoia—about $35—and the mill building, which, they contend, is
only worth the value of the materials of which the building was constructed
after being dismembered, which would, of course, be only nominal.    They
further contend that the corporation committed an act of bankruptcy within
four months preceding the filing of said petition, to wit, about March 18,
1911, in that said corporation, being insolvent, executed a transfer by mort-
gage of all of its property to the Bank of Senoia, which mortgage, they con-
tend, was for the principal sum of $9,257.22, and that it was given to secure
a pre-existing unsecured debt due the Bank of Senoia, and that said transfer
was executed by the corporation to the bank for the purpose of giving a
preference to said bank, and with intent to hinder, delay, and defraud
the petitioners and other creditors of the corporation.

## "Contentions of Alleged Bankrupt.

"A large part of the evidence taken before me was directed toward the
validity of each and every claim introduced by the petitioning creditors
as being a debt against the corporation.    The corporation denied every item
submitted except the debt of the Bank of Senoia.    As to this last debt, it
contends that the true intent and purpose of the execution of the mortgage
was to secure money to pay all of the indebtedness of the mills, and not
for the purpose of hindering, delaying, and defrauding its creditors; but,
on the contrary, that it did in fact pay every debt it owed with a portion
of the money secured from the bank on this mortgage.

"It claims in the way of assets the building known as the building of
the Senoia Duck Mills at Senoia, Ga., the value of which was variously
estimated at the hearing by experts and other witnesses at from $10,000 to

$17,000; the machinery located in said building, valued at from $40,000 to $50,000, together with certain other choses in action claimed by the company as an asset, the same being unpaid stock subscriptions to the capital stock of the corporation, amounting to approximately $20,000. It does not claim the actual legal title to the land upon which the mill is located, but it does claim such an equitable interest in said property as to enable it to secure a complete title after certain legal proceedings are had, and that, therefore, the said land is in truth and in fact an asset. The facts under which the situation with reference to the land arises will be gone into in detail later on in this report.

"After the evidence was all in, and the arguments began, counsel for the alleged bankrupt stated in open court to the master that, for the sake of the argument, they would admit all the claims introduced in evidence as being debts of the corporation were correct and due, and, further, that the original petition in bankruptcy, together with two certain interventions that had been subsequently filed, constituted a good petition, so far as the number of petitioning creditors were concerned, and so far as the requisite amount of indebtedness as required by the national bankruptcy act was concerned. These propositions had been disputed during the taking of the evidence, but they are thus eliminated by the statement of counsel, and therefore the questions that are now necessary to be gone into by the court are: First, does the Senoia Duck Mills own the machinery in the mill building at Senoia? and, secondly, has the corporation such an equitable interest in the land upon which the mill is located as that it could be properly said that this land was in fact an asset of the corporation at the time this petition for bankruptcy was filed?

"If the corporation is correct in the above contentions—that is, if the mill owns the machinery and the land—it will not be necessary to go further into the question of solvency, as these assets alone would make the mill clearly solvent, even admitting that all the claims introduced are bona fide debts. This was agreed to, as stated, during the argument by counsel by both sides, and, as I now consider the case, a large portion of the evidence can be thus eliminated.

"First will be taken up the question of the circumstances under which the corporation acquired possession of the machinery in question and their claim of title as gathered from the evidence produced. The idea of the organization, afterwards known as the Senoia Duck Mills, was conceived and discussed in the early fall of 1909, and was later formally organized, and a charter granted. Its promoter and leading spirit was Dr. N. G. Long, and it can be reasonably inferred from this testimony that, from its very conception up until the present time, Dr. Long has been in point of fact the real head of the corporation, although he was not an officer all the time.

"On February 5, 1910, while Dr. Long was vice president, he, together with T. J. Eady, entered into the following contract with George P. Howard for the purchase of the machinery, the title to which is now in dispute.

"'Atlanta, Ga., February 6, 1910.

"'To Chas. P. Glover Realty Co.:

"'We make the following proposition:

"'(1) Geo. P. Howard to return to us all the $35,000.00 stock given him under agreement between him and the Eady Investment Company, dated September 25, 1909.

"'(2) For this we are to dismiss at our expense all lawsuits or litigation in our behalf against Geo. P. Howard, this being in full settlement of any claims of ours against him or the machinery or Bushy Coal & Coke Company notes mentioned in above agreement of September 25, 1909, said suits to be dismissed upon acceptance of this proposition and the delivery of the Eady Investment stock and the relinquishment made to any claim he may have on $30,000.00 of Eady Investment stock, and to hold us harmless on our indorsement of Catlin note of $12,000.00 or any other obligation given him.

"'(3) It is further agreed that we will deliver to said Howard $30,000.00 of paid-up capital stock of the Senoia Duck Mills (the remainder of said Senoia

Duck Mill stock to be paid for in money by its subscribers, $60,000.00 of stock having been subscribed for) for certain machinery owned by Geo. P. Howard and National Duck Mills as it now stands in the National Duck Mills' plant in Atlanta. The Senoia Duck Mills are also to pay $300.00 in full for expenses of moving said machinery to Senoia, Ga., it being understood that they are not to be bound for any amount in excess of $300.00, said Howard agreeing to deliver said machinery f. o.·b. cars in Senoia. Said Howard to provide storage for thirty days after February 13, Senoia Duck Mills to arrange for storage after thirty days.

" '(4) Should we deliver said stock to said Howard before noon, February 12, 1910, or furnish satisfactory evidence that it will be delivered, and also before February 12. 1910, cause the Senoia Duck Mills to submit to W. L. Beyer and James Escott the following proposition for their services for operating the plant, pay Beyer $2,000.00 per annum salary and to issue to him $3,000.00 of the capital stock, said stock to be issued to them and held in escrow and delivered after rendering two years' service at the above-named salaries, should we perform this service, we are to receive $6,000.00 of the $30,000.00 capital stock issued to Howard.

" '(5) It is understood that if the above agreement (paragraphs 3 and 4) is not carried out by February 12th Howard is released from obligation to deliver machinery mentioned.

" '(6) Should said Eady and Long fail to carry out agreements as set forth in paragraphs 3, 4 and 5. it shall not affect paragraphs 1 and 2.

" '(7) Said Howard is to have until 6 p. m. this day to accept this proposition.                                            " 'N. G. Long.
                                                   " 'T. J. Eady.

" 'Accepted February 5th, 5:55 p. m.
                                                   " 'Geo. P. Howard.'

"Subsequently, Dr. Long, representing himself and Eady, undertook to sell to the company this machinery, and, in pursuance thereof, entered into the following contract:

                                    " 'Senoia, Ga., February 16, 1910.
" 'State of Georgia, County of Coweta:

" 'This contract and agreement made and entered into on this 16th day of February, 1910. between N. G. Long, of the county of Elbert and state of Georgia, and the Senoia Duck Mills, a corporation under and by virtue of the laws of Georgia, witnesseth: That the said N. G. Long has sold to the said Senoia Duck Mills a certain lot of machinery known as Duck machinery, same now located in the city of Atlanta, Ga., and known as the National Duck Mills (a list of said machinery has already been furnished the said Senoia Duck Mills and which is made a part of this contract of sale) for the sum of $30,000.00 with an additional $300.allowance by said Duck Mills to said N. G. Long for freight of the machinery which is to be delivered by said Long f. o. b. cars on side track, at the site of the Senoia Duck Mills at Senoia, Ga., within ninety days from date. The said Long and T. J. Eady is to receive in full payment for said machinery $30,000.00 in common stock of said Senoia Duck Mills. The $300 for freight above named is to be paid to the said Long in cash, not stock. It is further agreed between the parties hereto that if the shafting of the machinery is not sufficiently strong to run said machinery the said N. G. Long agrees to furnish other shafting that will be sufficiently strong to run said machinery without additional charge to the said Senoia Duck Mills. Should any additional shafting owing to a different arrangement of said machinery be necessary, then the said Senoia Duck Mills is to furnish that. The said Senoia Duck Mills agrees to cause its subscribers to pay in $30,000.00 in cash. same being for the purchase of that much of the common stock of the said Senoia Duck Mills.

" 'Signed in duplicate.                            N. G. Long.
" 'Accepted with all conditions and terms.
                                    " 'Senoia Duck Mills,
                                        " 'J. C. Arnall, Pres.
                                        " 'Vindex Hand, Secy.
" 'Erasures and interlineations made before signing.'

"It will be noticed that,. under the contract of Eady and Long with George P. Howard, both parties to the agreement were to do certain things. Long and Eady were to pay Howard thirty thousand dollars of paid-up capital stock of the Senoia Duck Mills, and it was represented in this contract that the remainder of the stock of the said Senoia Duck Mills was to be paid for in money by its subscribers. It would seem from this contract that Long and Eady were undertaking to guarantee that this would be done, and, further, that the Senoia Duck Mills would pay to Mr. Howard three hundred dollars for expenses in moving the machinery to Senoia. Howard, on the other hand, agreed to take care of certain promissory notes in favor of Catlin & Company for twelve thousand dollars, signed by the National Duck Mills and indorsed by Howard, Eady, and Long.

"Howard later shipped the machinery to Senoia, consigned to himself, and the cars containing the machinery were side-tracked at the mill, but were not unloaded immediately. They were later unloaded, and the machinery installed in the mill building in June, 1910. And right at this point there is a serious dispute in the evidence as to who authorized the unloading of the machinery. It will be remembered that the machinery was consigned, not to the mills, but to George P. Howard himself, and the proper and regular way for the mills to have gotten the machinery would have been to have presented the bills of lading to the railroad company, indorsed to it by Mr. Howard. Instead of that being done, Mr. W. S. Travis, the agent of the road at Senoia, testifies that Mr. Howard came to Senoia and called him up over the telephone and directed him to deliver the machinery to the mills, and that the cars were unloaded in accordance with Howard's telephone instructions. This Mr. Howard denies. He testifies that he did go to Senoia, and that he did call Mr. Travis on the telephone, but that he simply requested him to deliver certain of the cars of machinery known as 'foreign cars' first, when he was finally directed to deliver the machinery. He claims that he never did instruct the railroad to make the delivery. Mr. Howard testifies further that Messrs. Eady and Long had breached their contract with him in various particulars, and that, for that reason, he did not deliver the machinery, and that he has never authorized it to be taken off the cars. His contention is that the corporation was never legally organized, that the stock subscriptions guaranteed to be paid for in cash had not been paid, and that the purchase price of the machinery of thirty thousand dollars of stock had not been delivered to him, as had been agreed upon by Howard with Eady and Long. Mr. Vindex Hand, the secretary-treasurer of the corporation, testified that he remembered the occasions of Mr. Howard's visits to Senoia, and that Mr. Howard had never in his presence made any claim of ownership of the machinery, and that his only claim was for storage and freight charges incurred by him that were to be refunded under his contract with Eady and Long. Other officers and directors testified that they had no knowledge of Mr. Howard's claim of title to the machinery, that the corporation did not know and never had known Mr. Howard in the transaction, but that it had purchased the machinery from Dr. Long in good faith and for value, and that it had been delivered to the company under the direction of Dr. Long, in conformity with his contract with the mills, dated February 16, 1910. as quoted above.

"From the testimony of these officers, I think it is reasonably certain that the corporation cannot be charged with knowledge of the Howard and Eady and Long contract, but that the board of directors of the corporation believed that Dr. Long and Mr. Eady held complete title to the machinery, and that a purchase from these parties would protect the company. But Dr. Long was vice president of the corporation and a director, and right there arises the serious and troublesome question in the case, and that is whether or not Dr. Long's knowledge of the transaction with Howard could. be properly charged to the Senoia Duck. Mills. It is, however, in my opinion, purely a question of law, and can be decided without reference to the disputes that have arisen in the testimony, and the view I am obliged to take of the law governing matters of this character makes it unnecessary for me to discuss at length the merits of the controversy arising under the contract of February 5, 1910, between George P. Howard, on the one hand, and Long and Eady

on the other. If this contract had been made with the Senoia Duck Mills, instead of with Eady and Long, it would, of course, bring up the question of whether or not it had been breached, and might make it necessary that this case be decided in a different way. But I am not undertaking to decide that controversy, as I do not believe under the law this corporation is a party or privy to the Howard and Long agreement, or could properly be charged with knowledge of the context of said contract; and it would therefore follow that, having bought the machinery in good faith and without notice, it would necessarily be properly considered an asset of the mills. This would certainly be true, at least, until it is decided differently by the proper court having jurisdiction of this matter.

"In Cook on Corporations (4th Ed.) § 727, p. 1558, will be found the following: 'It is well settled that a corporation is not chargeable with knowledge of facts merely because these facts were known to its incorporators, or stockholders, or clerk, but the corporation has knowledge of facts which come to the knowledge of its officers or agents while engaged in the business of the corporation, provided those facts pertain to that branch of the corporate business over which the particular officer or agent has some control. Thus, a corporation has been charged with notice of facts which were known at the time to its agent, local agent, or superintendent. So, also, as regards the higher officers of the company. Thus the company has been charged with notice of facts known to the treasurer, secretary, cashier, and manager. Notice to the president of a bank is notice to the company, unless he in interested on the other side of the transaction. * * * Knowledge by an officer, derived as an individual, and not while acting officially for the corporation, cannot operate to its prejudice, and will not be imputed to it.'

"In this case, it is clearly apparent that Dr. Long was not only not acting for the corporation, but his interest was adverse to that of the corporation.

"Following this general principle, it has been held by the Supreme Court of Georgia, in the case of People's Bank of Talbottom v. Exchange Bank of Macon, 116 Ga. 821 [43 S. E. 269, 94 Am. St. Rep. 144], third headnote: 'A corporation is not to be charged with notice of facts of which its president acquires knowledge while dealing in his private capacity and in his own behalf with third persons, nor is knowledge on his part thus acquired imputable to the corporation, while acting through another official; it deals with him at arm's length, as with any other individual representing himself alone.'

"Judge Pardee holds, in the case of First National Bank of Sheffield et al. v. Tompkins, 57 Fed. 20 [6 C. C. A. 237], as follows: 'Where a bank acquires title to real estate by conveyance from its president, who held the land under a deed reciting full payment of the purchase money, and it has no actual knowledge that the purchase money was not in fact paid, it is an innocent purchaser without notice, and is not chargeable with constructive notice because of the knowledge of its president.'

"In this connection, see Levy & Cohn Mule Co. v. Kauffman, 114 Fed. 170 [52 C. C. A. 126], fifth headnote. This is also a Fifth Circuit case, and in it Judge Shelby holds the same general principle of law indicated above.

"It might be said that this state of affairs would work a hardship on Mr. Howard, the claimant to this property, provided he has any enforceable rights under his contract with Eady and Long; but it must be remembered that he has his remedy against them by a proceeding in the proper way in the state courts.

"The land upon which the building belonging to the Senoia Duck Mills is erected was owned jointly by C. F. Sasser, of Senoia, Ga., Thomas Berry, of Rome, Ga., and Mr. Harrison, of Senoia. Mr. C. F. Sasser was on the building committee of the Senoia Duck Mills corporation, and had made a verbal agreement, acting for himself and Mr. Harrison and Mr. Berry, to sell the 10-acre tract now in possession of the mills at an agreed price of $75 an acre, and he agreed for himself to take his one-third interest in the land in stock of the corporation at par. After the building was commenced, but before the transaction was closed, C. F. Sasser died, and his brother, W. M. Sasser, was appointed administrator of his estate. W. M. Sasser then bought from Harrison his one-third interest in the property. Mr. Berry went

to Europe, leaving the matter in charge of W. M. Sasser. The preponderance of the evidence is that the land trade would have been closed before this bill was filed had it not been for the death of Mr. C. F. Sasser. As soon as he died, the question arose as to whether or not his administrator could make title to the one-third interest owned by the dead man without an order of court directing him to do so. Consequently, a suit was instituted by the mills against the administrator to compel the specific performance of the parol contract of sale. To this suit Sasser, administrator, filed an answer admitting all the allegations in the petition, and a decree will be entered by consent at the fall term of the superior court. W. M. Sasser and Thomas Berry, the other owners of the land, have agreed to take $75 per acre for their two-thirds undivided interest, provided the trade is closed 'within a reasonable time,' as Mr. Sasser testifies. The petitioning creditors contend that, as there are minor heirs of the estate of C. F. Sasser, it would not follow as a matter of law that the mills would acquire title to the property even if the superior court granted an order requiring the administrator to carry out the trade. In the second place, they contend that the mill has no money with which to pay the W. M. Sasser and the Berry interests, even though they are willing to sell at the agreed price of $75 per acre. They further claim that, at the time this bill was filed, the mills did not have title to the land, and that it is the duty of the court to look at the situation as it stood on that date, and not take these other matters into consideration.

"It has been held by the Supreme Court of Georgia, in the case of White v. Mitchell, 69 Ga. 759, that 'one who takes possession of land under a parol contract of purchase, and erects valuable improvements thereon, upon the faith of such contract, may maintain a bill for specific performance thereof.'

"It would seem under this authority that such a bill would lie against C. F. Sasser during his lifetime, as there is no dispute in the evidence that the trade with him was in fact made. I think, too, that it is well settled by the great weight of authorities that such a bill will lie against the administrator, and that an order of court directing him to carry out his dead brother's agreement with the mills would be binding on all parties, and will put title to his interest in the corporation. It would certainly be the justice of the case, as these people have gone on in good faith and built a large and valuable stone building on this property, and have installed the machinery therein.

"With reference to the interests of W. M. Sasser individually and that of Thomas Berry, it is true that the mills have only $35 in actual money, and there is a good deal in the contention of counsel that they have not the cash to pay these parties, even if they are willing to trade and have agreed to trade. I do not think it is necessary to decide this question, for the reason that the national bankruptcy act provides that 'a person shall be deemed insolvent whenever the aggregate of his property * * * shall not, at a fair valuation, be sufficient in amount to pay his debts.' It is not, therefore, essential that this corporation have actual money enough to pay its debts immediately, but that its property, fairly valued, will aggregate more than its liabilities; and, having found that the title to the machinery is in the company, this question is settled so far as this case is concerned.

"As to the act of bankruptcy alleged to have been committed, I think the proof indicates that a preference was intended to the Bank of Senoia when this mortgage above referred to was given. At the time the mortgage was made, the company owed the bank on unsecured notes and overdrafts about $7,500. The mortgage was given for $9,257.22, and the company claims that they used the balance of this money after securing the bank to pay all of the other debts it owned at the time. The majority of the amount of the mortgage, however, was used to secure the bank for the payment of its preexisting debt, and, as the cashier of the bank was also the secretary and treasurer of the corporation, it would seem that it was the idea of both the bank and the corporation to prefer the bank as against any other creditors of the Senoia Duck Mills. A prerequisite, however, to the act of bankruptcy as charged in this bill, is that the transfer or mortgage shall have been made while the corporation was insolvent, and, as I have found that it was

solvent at the time. I must necessarily find that the act of bankruptcy as charged was not committed.

### "Summary.
### "Findings of Fact.

"I find as a matter of fact that the assets of the Senoia Duck Mills at the date of the filing of this bill, taken at a fair valuation, exceeded its liabilities.

### "Findings of Law.

"(1) I find as a matter of law that the corporation was solvent at the date of the filing of this application for an adjudication in bankruptcy.

"(2) I find that the corporation did not commit the act of bankruptcy, as charged in the petition for adjudication."

[1] This reference and the report of the special master come within and must be controlled by the law laid down by the Supreme Court of the United States in several cases. The case most frequently referred to is that of Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764. The second headnote of that case is in the following language:

"When the parties consent to the reference of a case to a master or other officer to hear and decide all the issues therein, both of fact and of law, and such reference is entered as a rule of court, it is a submission of the controversy to a special tribunal, selected by the parties, to be governed in its conduct by the ordinary rules applicable to the administration of justice in tribunals established by law; and its determinations are not subject to be set aside and disregarded at the discretion of the court."

[2] Another case to the same effect is Davis v. Schwartz, 155 U. S. 631, 15 Sup. Ct. 237, 39 L. Ed. 289. The first headnote to this case is in this language:

"In a case referred to a master to report the evidence, the facts, and his conclusions of law, there is a presumption of correctness as to his finding of facts similar to that in the case of a finding by a referee, the special verdict of a jury, the findings of a Circuit Court in a case tried by the court under Rev. Stat. § 649 (U. S. Comp. St. 1901, p. 525), or in an admiralty cause appealed to this court."

The reasons for the rule stated in the headnotes are fully elaborated in the opinion in each case.

These decisions and others of like character have been frequently invoked, followed, and applied in cases in this court on exceptions to reports of special masters selected by the parties.

[3] The special master found as a fact that the only notice the Senoia Duck Mills had of the contract between Howard, Eady, and Long was through Dr. Long, and as Long was dealing with the Senoia Duck Mills not in his capacity as an officer of the mills, but adversely and as a seller to it, the corporation would not be bound by this knowledge. In this view of the law he is undoubtedly supported by the decisions he has cited, which are controlling in this court, certainly as to the decisions of the Circuit Court of Appeals, and probably also as to the decisions of the Supreme Court of Georgia, inasmuch as this is a Georgia corporation.

That there was evidence to support the master in finding that the only knowledge the corporation had of the contract with Howard,

referred to above, was through Dr. Long, is manifest from the record, and it is immaterial that there was evidence to the contrary if there is evidence to support the master in this conclusion.

As stated by the master, any controversy between Mr. Howard and the Senoia Duck Mills ought to be and can be settled in a state court of competent jurisdiction.

The exceptions to the master's report are overruled, and the report confirmed.