DAVID E. KENNEDY, Inc., v. BEAVER TILE & SPECIALTY CO. et al.

(District Court, S. D. New York.     February 7, 1916.)

**1.** PATENTS ☞7—SUBJECTS OF PATENTS—"PROCESS."

The method of making a floor by laying cork tiles under pressure is patentable as a process.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 6; Dec. Dig. ☞7.     •

For other definitions, see Words and Phrases, First and Second Series, Process.]

**2.** PATENTS ☞21—"INVENTION"—PROCESS.

The application of an old process to a new material may involve "invention," but generally speaking it does not, and especially where the method operates in the same way and effects the same results.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 23; Dec. Dig. ☞21.

For other definitions, see Words and Phrases, First and Second Series, Invention.]

**3.** PATENTS ☞328—INVENTION—METHOD OF LAYING CORK TILES.

The Kennedy patent, No. 1,054,423, for a method of laying cork tiles in floors under pressure in all directions, *held* void for lack of invention, in view of the prior practice of laying wooden blocks in practically the same manner.

In Equity. Suit by David E. Kennedy, Incorporated, against the Beaver Tile & Specialty Company and Isaac R. Russell. On final hearing. Decree for defendants.

This is the usual bill in equity for infringement of a patent to David E. Kennedy, No. 1,054,423, for a method of laying cork tiles in floors. It is not necessary to go into the details of the patent, except to say that the method is to lay the floors in a plurality of hollow squares, so filling them in that the cork tile shall be laid under pressure in all directions. The corner tiles of the square are to be nailed down at such distances apart that in filling between them to make the outer lines of the square, the tiles must be put in under pressure. This is done by canting up the edges and forcing them down. Thereafter the square is filled up in the same way with rows of tiles, until the space comes down to four tiles, which must be laid in a kind of canted pyramid and all forced down together at the same time, thus putting the blocks under pressure in all directions. It is not necessary to consider the language of the claims, all of which are in suit, nor is it necessary to consider the question of infringement, which was not seriously disputed. The principal defenses are four: First, that the patent does involve invention, but is to be found in the prior art; second, that the claims are broader than the invention itself; third, that the invention was not originated by the patentee, but by one Brink; and, fourth, that the patent is not for a patentable art or process under the statutes.

Hillary C. Messimer, of New York City, for plaintiff.

Stephen J. Cox, of New York City, for defendants.

LEARNED HAND, District Judge (after stating the facts as above). The first question I shall take up is whether the claims of the patent are broader than the alleged invention, and therefore invalid. The objection is that the claims do not represent the real invention. The real invention is supposed to be for laying the floor in a plurality of

relatively independent squares or sections. Claims 1, 2, and 3 certainly include such element, and claims 6 and 7, in my judgment, contain the same, although not so certainly. Claims 4 and 5 need not be considered under these circumstances.

[1] The next objection I shall consider is that the patent is not for a patentable art or process, apparently upon the theory that an "art" must change the "substance" of the materials to something new. In Cochran v. Deener, 94 U. S. 780, 24 L. Ed. 139, the Supreme Court said that an art was an act or series of acts performed upon a subject-matter which was transformed or reduced to a different state or thing. The last expression of the court is Expanded Metal Co. v. Bradford, 214 U. S. 366, 29 Sup. Ct. 652, 53 L. Ed. 1034, in which the court disclaims any intention, as in Cochran v. Deener, of confining a process patent to a change in chemical substance. Even if an "art" requires that the old elements be transformed into some new thing, a new thing may be created merely from mechanical readjustments or the new juxtaposition of parts. In this case a floor results from the laying of tiles under pressure, and such a floor is a different thing from cork tiles and brads and underflooring. The method of creating such a floor from such elements is surely a patentable process.

The next question is of invention. Wood carpet has been laid for many years, and a common mode of laying was to lay out a hollow square, and put in each side of the square under pressure. The tiles are laid with the grain alternately parallel with, and normal to, the side in question, and the space between the end tiles, which are firmly nailed down, is a little too short for the tiles to be put in them. A tile whose grain is normal to the side of the square is then put in buckled up. When this tile is forced down, the whole row from end to end is put under pressure. After the four sides of the square are thus made, the panel so made is filled in by rows of similar character; each row being locked in the direction of its length by pressing down a buckled tile.

The tile I have mentioned were all split into strips and the strips pasted upon canvas, so that they had a relative motion upon the axis of the grain. Some 20 years ago it was, however, common to lay solid wood tiles made in various ways. Some of these were just like the present wood carpet tiles, but were glued firmly side by side, making a solid tile of necessary size. Some were made of small squares, with the end grain of the wood for the wearing surface, the squares held together by molten lead. Some were solid pieces of wood. Some were strips glued together in sections of three feet by one. All these solid tiles were laid in substantially the same method as the wood carpet tiles; that is to say, they were laid within hollow squares first made, and each row was locked by canting the last tiles and forcing them in, thus putting the whole row under pressure. Moreover, the rows were run along adjacent sides of the hollow square, so that the pressure was exerted in two directions. An exception to this is to be made in the case of those tiles made up of small squares, because these were tongued and grooved, but there is no doubt that these rows, also, were put in with pressure in one direction. They may have been put in parallel to each other. Similarly in the case of the oblong sections, they may have been staggered, as suggested, and run in parallel rows,

each under pressure only in one direction, but they were tilted up and pressed down to secure pressure.

If a hollow square be filled in by locking alternated rows set normal to each other, in the end one will come to four tiles at one corner, just as indicated in the patent. This needs no invention; it is the necessary result of the process. These last four tiles, if they are to be put in at all, must be canted into the form of a pyramid and pressed down. Similarly in the case of wood carpet tiles. It is possible either in the case of wood carpet tiles or of solid tiles to lay the whole floor without locking it, leaving a buckled tile, or two canted tiles, in each row, and pressing them down after they are all in place; but there is this difficulty in such a method—i. e., that the last two buckled tiles, or the last two canted tiles, to be pressed in, will already be under pressure normal to the pressure they are themselves to exert, and that this will have a tendency to shear their edges as they are pressed down. There is not the least reason to doubt, therefore, that when solid tiles were laid under pressure the last four blocks were put in as indicated in the patent. The witnesses Taylor, Boynton, and McBride say so, and they are each disinterested. If each row was locked as laid, the result must have been so; if the rows were not, the shearing would have resulted, and it would have been very hard to get in the last two buckled tiles, or last four canted tiles.

The plaintiff says that the method is impracticable when applied to solid blocks. I am not disposed to differ with him, if he means only that you cannot compress wooden blocks—of course not along the grain, and substantially not across the grain. No pressures are available which would effect that result, nor was that the purpose. What the floor layers needed was to press together the cracks between the tiles, if solid, and between the strips, if laid as wood carpet. Pressure was necessary for that, and the method gave it. I can see no reason to question that it was produced in precisely the same way that pressure is produced by the patent in suit. The fact that the patent contemplates compression of the cork tiles only means that the degree of pressure is different from that used in wood carpets, or solid wooden tiles.

[2] Therefore the sole claim to invention of the process lies in the application to a new material, cork, of a process formerly used upon a similar material, wood. The substitution of a new material in a mechanical combination may, of course, sometimes require invention. Frost v. Cohn, 119 Fed. 505, 56 C. C. A. 185; Frost v. Samstag, 180 Fed. 739, 105 C. C. A. 37. But generally the rule is otherwise. Especially ought this to apply to a process patent, where the same process is used upon another material. I do not mean to say that it may not require invention to see the applicability of an old process to a new material. It may take the highest; but I do think that, generally speaking, it will not do so, especially where the method operates in the same way and effects the same results. In the case at bar, the results of the process are precisely the same, whichever material you use, except, of course, that you finish with the same material with which you started.

In Brown v. District of Columbia, 130 U. S. 87, 9 Sup. Ct. 437, 32 L. Ed. 863, Cowing, the patentee, had got a patent for a method of making street pavements, which was to lay wooden blocks made in the form of frusta of square pyramids and to fill in the square so left open with earth and gravel. In the prior art Chambers had a patent for the same thing in stones, the filling to be anything insoluble in water; Lindsay had a patent of the same sort, the interstices to be filled with small stones and grout; and Nicholson had a patent for blocks of wood spaced by pieces of wood to be filled with concrete. The Supreme Court held that, as the change between Cowing and Chambers or Lindsay was merely a change in material, without any new mode of construction or new result, the patent was void. Upon the proof of the wood flooring art and this case I should have no hesitation in declaring the patent void, were it not for the somewhat surprising history of the cork floor art itself.

[3] Cork floors were laid as early as 1896, and between 1900 and 1910 the industry grew largely. Much of the laying was done by wood carpet and parquetry artisans, who carried over to it the knowledge they had brought with them. Yet there is no evidence that in those years cork floor layers ever adopted the wood carpet method, save Brink, of whom more later. Hasbrouck is himself a good example. He was a wood carpet man who began laying cork tiles in 1910. He cannot say how his wood carpet layers put down his tiles; but, though he is defending this suit, he brings none of them forward to show that the transition between one and the other method was instinctive. On the other hand, the plaintiff proves with fair certainty that Hasbrouck was using the old method of "blocking up" until about 1914, when he got Wills, who had learned the hollow square method from Kennedy, after which Hasbrouck adopted it universally. Kennedy's own men were wood carpet layers for some time after he began; but he never saw any one lay a cork floor, except in the old way. Yet when the new method was once adopted it immediately displaced the old "blocking up" method absolutely, and was found to save a great proportion of the cost of laying the floors, as well as to make a tighter and better floor. This history of the introduction of the patented method into the cork industry is at first sight undoubtedly of force; it seems to present an instance where the skilled artisan, who knew the old wood carpet method, when faced with the new need, continued his routine without making the apparently obvious adaptation of the old process to the new need. However, when the law takes for the standard of invention the imagination of the skilled artisan, I suppose that it does not mean an artisan working at daily wages, who has no interest in labor-saving methods, but rather the contrary; what the law contemplates is the invention of a skilled artisan, working under the stimulus of some gain which will come to him from the exercise of his imagination.

There is no reason to suppose that the men employed by Kennedy or Hasbrouck had any concern in changing the methods as they found them when they got there. With the masters it was different, but there is no proof that any of the masters engaged in floor laying were fa-

miliar with the wood carpet flooring, except Hasbrouck himself. Brink, it is true, did work on contract; but Brink had been laying cork floors for only 18 months prior to the floor of the Pennsylvania ticket office, and it does not appear that he ever knew the customary methods of laying wood floors. The industry was always in few hands, not more than six in all, and those continually diminished in numbers as Kennedy came into more exclusive control. The amount of business ever done by any one but Kennedy and the length of time that the others lasted does not appear. It would be gratuitous to assume that all of these competitors were for a substantial length of time working to secure an economy which Kennedy finally discovered. With Hasbrouck, and with him alone, the case is different, because, though he had been for over 30 years in the hardwood floor business, he laid cork floors for 4 years without adopting the method of wood carpets. Still I do not think we can base invention wholly upon the fact that Hasbrouck failed to make this discovery independently. He swore that he did not know how his men laid their floors, but left it to them. Whether he ever exercised his faculties of invention upon the subject-matter is unproved, and, if he did, at most he would only be one, and one case alone forms no just test for invention.

When, on the other hand, we turn from the wood carpet method to the solid block method, the case is stronger against invention, for that went out of practice some 20 years ago, before the cork tiling came into any substantial use, and there is no evidence that of all those who ever turned their hands to cork tiles any one except Hasbrouck ever had knowledge at all of the method of laying solid block floors. Indeed, it does not appear that Hasbrouck himself had any such knowledge; such a conclusion rests in inference alone. Hence, if we are to conclude that some invention was necessary to adapt the wood carpet method to cork floors, since it was never done before Kennedy, at least we have no evidence to show that the mere change of material involved in using the solid block method for cork floors, was beyond the competence of any mind which, knowing that method, was faced with the necessity of laying cork floors.

The examiner who allowed the application had not before him the art as it is in this case. Even on the crude analogy of the method of laying matched flooring, he was for long disposed to deny the application; and if that analogy caused him so much difficulty, we have no reason to suppose that he would ever have allowed the application, had he known methods of laying wood carpets or solid block floors. There is no presumption of validity over those prior uses which were not before the Patent Office.

Although a supposed invention rests only in a change of material, we may well be justified in some misgiving of our right to assume that the change was obvious, when we find that it has not been used before and that it at once supplants other methods. Yet in applying such a test we are liable to be misled without scrutiny; we are justified in demanding some explanation of why so simple a substitution should have for so long escaped discovery. In a narrow industry, resting always in few hands and those decreasing in number, the in-

ference of invention may be slight from such success; where those concerned in the art are not shown to have known the prior art, it is weaker still. Many other considerations than the absence of inventive genius may have delayed the discovery; many others than its value may promote its success. In the case at bar the cork tile industry may have been in its mere experimental stages until about the time when the process was applied. At least this plaintiff tried very hard to convince the court that all cork floors laid in cement were experimental up to within six months of the discovery of this process as he now claims it. Kennedy v. United Cork Companies, 225 Fed. 371, 140 C. C. A. 395. We know very little about the early years of the industry and still less about who were concerned in it. At present it appears largely in the plaintiff's own hands, who can hardly claim the gift of invention because of his own early inability to lay cork floors by the old wood carpet or solid block methods. The case is one in which I cannot believe that invention was necessary for a change in material.

The last question is of Brink's prior use in the barber shop of the Engineers' Club in May, 1909. This rests upon Brink's own testimony, in a measure contradicted by Kennedy, and possibly to some extent corroborated by Wills, the brad boy. As to Wills, I hardly think I need bear much upon his testimony. At the time he was only 15 years old, and some of the time he was out of the room. He is confessedly doubtful in his memory about what he did see, and I question whether he would have understood it at the time. Turning to Brink, it is not necessary to hold that he did not cant up some of the tiles, or that he did not lay out the dark border first, within which he put the central panel. By his own account, his purpose is now somewhat uncertain. Part of his testimony reads as though he practiced the process only by the accident of having tiles which ran a little larger than he supposed; part reads as though he were consciously putting in the tiles under pressure. The result must be a little doubtful; I think that he probably intended to get his tiles set under some pressure, but that he did not deliberately make his square scant for that end. He says that he got the whole of the central panel, at which he was at work when Kennedy interrupted him, under pressure in both directions. This is hardly possible, because now it is under pressure only in one direction, showing openings in the other. It is very difficult to see how he could have practiced the hollow square method in the central panel and failed to get either no cracks or cracks in both directions.

Moreover, I think it strange that he should not have put in practice his discovery in the numerous jobs which he did on his own account during the following year. His own explanation is that Kennedy had told him not to put in the tiles too tightly; but he does not pretend that Kennedy complained of the method in any other respect. Indeed, he went on and finished the job just as he began, except for easing up the pressure as Kennedy had wished. Why should he have lost the advantages of his discovery upon his subsequent jobs that year? There was no trouble in getting just as much or as little pressure as one wished by the method; it would save a good deal of time and give one straighter lines, just the same, whatever the pressure. Why not

explain to Kennedy the advantages, and show him how it was possible to get any required pressure? Even assuming Kennedy told him what Kennedy denies he said, I cannot quite accept the explanation, if he had fully comprehended the invention. If the case turned alone upon the proof of this prior use, I should not think that it was made out with sufficient clearness to be a defense.

The bill is dismissed, with costs, for lack of invention.