## WILSON–WESTERN SPORTING GOODS CO. v. BARNHART.

### No. 7807.

Circuit Court of Appeals, Ninth Circuit.
Jan. 6, 1936.

As Modified on Denial of Rehearing
Feb. 24, 1936.

Lyon & Lyon and Lewis E. Lyon, all of Los Angeles, Cal., for appellant and cross-appellee.

Frank L. A. Graham, of Los Angeles, Cal., for appellee and cross-appellant.

Before WILBUR, GARRECHT, and HANEY, Circuit Judges.

GARRECHT, Circuit Judge.

The cross-appellant and appellee, hereinafter called the appellee, filed a bill in equity for the alleged infringement of letters patent No. 1,639,547, to be referred to hereafter as the first patent and No. 1,639,-548, designated herein as the second patent.

Both patents were issued to the appellee on August 16, 1927.

The patents deal with alleged inventions in golf clubs, particularly with the manner of attaching a tapered hollow steel shaft to the head of the club.

The appellee is not in the business of manufacturing or selling golf clubs. The cross-appellee and appellant, to be referred to herein as the appellant, is one of the largest manufacturers and distributors of golf clubs and other sporting goods in the United States.

The suit was referred to a special master, with instructions "to take and hear the evidence offered by the respective parties and to make his conclusions as to the facts in issue and recommend the judgment to be entered thereon." The appellant excepted to the order of reference.

The master found that both patents are valid; that claims 11 and 12 of the first patent and claim 10 of the second have been infringed by the appellant by the sale of a type of golf club shown in the appellant's 1930 catalogue and constituting one of the physical exhibits sent up to this court; and that the appellant had not infringed either of the patents by the sale of another type of golf club disclosed in another exhibit.

Both the appellant and the appellee filed exceptions to the master's report. All exceptions were disallowed. The court below entered an interlocutory decree adopting the recommendations of the master. By stipulation between the parties, the final report of the master was adopted as the findings of fact and conclusions of law. Both sides have appealed from the decree.

In our view of the case, it will be unnecessary to consider the question of infringement. We will confine our discussion to an inquiry into the validity of the claims in suit.

In the first place, it is necessary to determine the weight, if any, that is to be given to the report of the master, under the circumstances of the instant case.

The order of reference provided in part as follows:

"It is therefore ordered that this cause be referred to David B. Head, Esquire, Special Master, to take and hear the evidence offered by the respective parties and to make his conclusions as to the facts in issue and recommend the judgment to be entered thereon; the said Special Master

\* \* \* is authorized and empowered to do all things and to make such orders as may be required to accomplish a full hearing on all matters of fact and law in issue in this cause, reserving to the Court the full right and power to review and determine all questions of fact and law upon exceptions to the report of said Special Master by the respective parties, as fully ,and completely had [sic] this reference not been made and as though this cause had been tried before the Court; the objection of counsel for the defendant [appellant] to the making of this order referring the cause to the Master is hereby noted, and an exception is allowed in favor of the defendant."

The Supreme Court has indicated that, in the absence of consent by both parties, the powers of a special master in chancery are limited, and that little, if any, weight is to be accorded to his conclusions on the general issues. In the leading case of Kimberly v. Arms, 129 U.S. 512, 523, 524, 9 S.Ct. 355, 359, 32 L.Ed. 764, Mr. Justice Field said:

"A master in chancery is an officer appointed by the court to assist it in various proceedings incidental to the progress of a cause before it, and is usually employed to take and state accounts, to take and report testimony, and to perform such duties as require computation of interest, the value of annuities, the amount of damages in particular cases, the auditing and ascertaining of liens upon property involved, and similar services. The information which he may communicate by his findings in such cases, upon the evidence presented to him, is merely advisory to the court, which it may accept and act upon, or disregard in whole or in part, according to its own judgment as to the weight of the evidence. [Cases cited.] In practice it is not usual for the court to reject the report of a master, with his findings upon the matter referred to him, unless exceptions are taken to them, and brought to its attention, and upon examination the findings are found unsupported, or defective in some essential particular. [Cases cited.] It is not within the general province of a master to pass upon all the issues in an equity case, nor is it competent for the court to refer the entire decision of a case to him, without the consent of the parties. It cannot, of its own motion, or upon the request of one party, abdicate its duty to determine by its own judgment the controversy presented, and devolve that duty upon any of its officers. But when the parties consent to the reference of a case to a master or other officer to hear and decide all the issues therein, and report his findings, both of fact and of law, and such reference is entered as a rule of the court, the master is clothed with very different powers from those which he exercises upon ordinary references, without such consent; and his determinations are not subject to be set aside and disregarded at the mere discretion of the court. A reference, by consent of parties, of an entire case for the determination of all its issues, though not strictly a submission of the controversy to arbitration,—a proceeding which is governed by special rules,—is a submission of the controversy to a tribunal of the parties' own selection, to be governed in its conduct by the ordinary rules applicable to the administration of justice in tribunals established by law. Its findings, like those of an independent tribunal, are to be taken as presumptively correct, subject, indeed, to be reviewed under the reservation contained in the consent and order of the court, when there has been manifest error in the consideration given to the evidence, or in the application of the law, but not otherwise."

See, also, Davis v. Schwartz, 155 U.S. 631, 636, 637, 15 S.Ct. 237, 39 L.Ed. 289.

In the instant case the order of reference was not made with the consent of both parties, but, on the contrary, the appellant specifically objected to such reference. So far as the record shows, the learned District Judge did not himself hear any of the testimony, but, by stipulation, adopted the master's report as his findings of fact and conclusions of law.

Under such circumstances, the report of the master, while taken as presumptively correct as provided in Equity Rule 61½ (28 U.S.C.A. following section 723), is not controlling, and the findings of the master are subject to be reviewed, and this is so particularly where the reference was not by consent but over the protest of one of the parties.

We turn, therefore, to an independent consideration of the validity of the claims involved in the instant case.

Claim 11 of the first patent reads as follows:

"In a golf club, a head member provided with a socket and with a shaft, the latter being secured at its one end within the inner portion of the socket, the portion of the shaft near the outer end of

said socket being freely movable within and relative to and about the outer end portion of said socket to prevent the buckling of said shaft at the outer end of the socket."

The text of claim 12 of the same patent provides:

"In a golf club, a head member provided with a socket and with a shaft, the latter being secured at its one end within the inner portion of the socket, the bore at the outer end of said socket being outwardly divergent forming a fulcrum about which said shaft is flexed longitudinally when striking a ball with the golf club."

Claim 10 of the second patent sets forth:

"In a golf club, a head having a socket, a shaft secured at one end within said socket, the portion of the shaft within the outer end of the socket being movable relative to the latter, and a flexible sealing member positioned at the joint between the outer end portion of said socket and said shaft."

Claim 11 of the first patent is directed to the free mobility of the part of the shaft near the outer end of the socket "within and relative to and about the end portion of the socket."

Such mobility between socket and shaft or rod is not new. It is disclosed in the patents to Heller, Nos. 1,551,563 and Re. 16,808 (reissued), dated September 1, 1925, and December 6, 1927, respectively, in each of which the following sentence appears:

"In accordance with the present invention, the lower end of the shaft [of a golf club] is fitted within the bore and a sleeve of rubber or other suitable resilient material is fitted within the bore throughout the length thereof and interposed between the shaft and the wall of the bore 6 to permit of relative movement and resilient action between the club head and the lower end of the shaft."

Similar teaching is found in Robertson's fishing rod patent, No. 206,264, of July 23, 1878:

"This invention relates to improvements in fishing-rods where the elasticity of the rod is preserved entire from the 'tip' to the extreme end of the 'butt'; and consists in making the butt in two portions, the smaller being inclosed in the larger, which is tubular and of sufficiently large bore to permit the smaller to describe throughout its whole length the curve it would naturally assume when bent, and which is now lost in the hand portion of the butt. * * *

"The bore or inclosure c is of larger diameter in its center than at its ends—that is to say, is elliptical in shape—in order that when the piece a is bent into a curved form by the strain upon the rod this curve shall extend from end to end, as the bore of the handle b is sufficiently large to permit of this. * * *

"The said joint at f permits of the slight endwise slip between the piece a and handle b which occurs when the rod is bent into a curve."

■ It may be objected that Robertson's patent did not deal with golf clubs. It is well established however, that "the application by the patentee of an old process to a new subject, without any exercise of the inventive faculty, and without the development of any idea which can be deemed new or original in the sense of the patent law" is "fatal to the patent." Brown v. Piper, 91 U.S. 37, 41, 23 L.Ed. 200. See, also, Roberts v. Ryer, 91 U.S. 150, 157, 23 L.Ed. 267, and 1 Walker on Patents (6th Ed.) § 76, pages 96–98, and the fifty cases there cited.

■ We conclude, therefore, that in view of the prior art, mere freedom of motion between the outer end of the socket and the adjacent part of the shaft does not amount to invention. Accordingly, we hold that claim 11 is invalid.

Indeed, the master in the instant case, while upholding the validity of both patents, found that "the claims in issue are directed solely to a flared construction" of the socket, hosel, or ferrule, as it is variously called in the record. Claim 11, however, is wholly silent regarding any such "flared construction."

Claim 12, on the other hand, specifically describes the outer end of the socket as "being outwardly divergent forming fulcrum about which said shaft is flexed longitudinally when striking a ball with the golf club." It is therefore necessary to inquire whether this form of socket, even if new, amounts to invention.

The master conceded that "at first glance it would appear that the flaring of the outer portion of the socket would be an obvious way in which to distribute the strain at the point of juncture of the shaft and hosel," but added that "an examination of the prior art patents does not

disclose any suggestion of such a construction." The master concluded that "this tends to strengthen the presumption of invention."

We do not think that this "obvious" means of distributing the strain at the juncture of shaft and hosel amounts to invention. Especially in view of the prior art dealing with the mobility of shaft and hosel with reference to each other, the flaring of the outer part of the hosel was an improvement of a mechanical, as contradistinguished from an inventive nature.

In Smith v. Nichols, 21 Wall. (88 U. S.) 112, 119, 22 L.Ed. 566, the court said:

"But a mere carrying forward or new or more extended application of the original thought, a change only in form, proportions, or degree, the substitution of equivalents, doing substantially the same thing in the same way by substantially the same means with better results, is not such invention as will sustain a patent."

So in the instant case, play between shaft and hosel had been taught by the prior art. By flaring the outer end of the socket, the plaintiff-appellee "carried forward" and made a "more extended application of the original thought," effecting "a change only in form," and "doing substantially the same thing in the same way by substantially the same means with [it is alleged] better results." Accordingly, the flared construction "is not such invention as will sustain a patent."

The real and practical dangers resulting from granting or approving a patent for mere mechanical improvements were pointed out in vigorous language in the case of Atlantic Works v. Brady, 107 U.S. 192, 199, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438:

"The process of development in manufactures creates a constant demand for new appliances, which the skill of ordinary headworkmen and engineers is generally adequate to devise, and which, indeed, are the natural and proper outgrowth of such development. Each step forward prepares the way for the next, and each is usually taken by spontaneous trials and attempts in a hundred different places. To grant a single party a monopoly of every slight advance made, except where the exercise of invention somewhat above ordinary mechanical or engineering skill is distinctly shown, is unjust in principle and injurious in its consequences.

"The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the art. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to lawsuits and vexatious accountings for profits made in good faith."

In the half century since the foregoing decision was rendered, "the process of development in manufactures" has been greatly accelerated. Hence the Supreme Court's words of warning are applicable with even greater force today than when they were uttered.

In our opinion, the flaring of the socket as taught in claim 12 is a "slight advance" in the art, not involving "the exercise of invention." Accordingly, we hold that the claim is void.

We turn finally to the third and last claim in suit, claim 10 of the second patent. As the appellee points out, that claim "is drawn to the same general features as claims 11 and 12 in the first patent, but with the additional feature of the inclusion of a bushing placed within the outer end of the hosel and between the hosel and the shaft."

We therefore must examine this additional feature for the purpose of ascertaining whether or not it involves patentable invention.

In his patent, the appellee thus describes the "flexible sealing member" of claim 10:

" * * * I have shown a flexible cap, sleeve, or band 5, around the joint between the outer end of the ferrule and the shaft

112

for excluding dirt, dust and grit from entering the ferrule and lodging between the same and the shaft and thus preventing proper co-action between the same. The sleeve 5 is preferably made of rubber in tapered form and is positioned with its thick end around the end of the ferrule, and the thin or fin end around the shaft. Thus, the shaft is permitted to flex, twist and expand relative to the ferrule and still exclude dirt, dust and grit therefrom. It will be noted that a similar sleeve may be positioned around the joints of the ferrules and shafts shown in Figures 3, 4 and 5, or a cap, or washer may be positioned within the end of the ferrule around the shaft."

The foregoing statement would indicate that the purpose of the cap, sleeve, band, or washer is to exclude dirt from the ferrule. The master so interpreted the claim, and pointed out that the function disclosed in the patent to Lard, No. 1,249,-127, dated December 4, 1917, "is the same, i. e., to exclude dirt from the socket."

The patent to Robertson, supra, teaches that "if desirable, an india-rubber or other packing, g, may be employed at the joint to insure the desired result and prevent water from getting access to the interior of the handle." The master points out that Robertson's "rubber bushing, g, provides a fulcrum point and excludes dirt from the bore in the handle" of the fishing rod. It is worthy of note, in passing, that claim 12 of the first patent in suit likewise contains a "fulcrum" teaching.

The master, however, seeks to distinguish Lard's disclosure from the appellee's, on the ground that "the relative movement between the shaft and socket in the structure of the patent is not found in the Lard club." He seeks to distinguish Robertson's teaching from the appellee's on the ground that "the outer portion of the handle is not flared and the bushing forms the joint between the handle and rod." Robertson's language, however, is that the rubber packing, like the appellee's washer, may be employed "at" the joint.

At any rate, the differences as to mobility and flare, the claims covering which have already been considered, do not alter the identity, in basic function of the respective sleeves or washers, namely, to exclude dirt, dust, grit, water, etc.

At this late day, it is not invention to assert that rubber, being flexible, will allow play at the joint between a shaft and a socket!

Similarly, the fact that a socket is flared, or the fact that the "flexible sealing member" is "positioned at" the joint, instead of, according to the master, "forming" the joint between shaft and socket, does not endow a rubber sleeve, cap, or washer with the quality of invention.

We therefore hold that, in view of the prior art, particularly the disclosures of Lard and Robertson, claim 10 of the second patent is void.

Accordingly, the decree is reversed, in so far as it adjudges that the three claims in controversy are valid and that the appellee is entitled to relief for the alleged infringement thereof. In so far as the decree holds that Exhibit 3 of the appellant's golf clubs does not infringe upon the appellee's claims in issue, it is affirmed. In other words, the decree is reversed on the appeal, and affirmed on the cross-appeal.

Affirmed in part and reversed in part.