MILLS ALLOYS, Inc., et al. v.
STOODY CO.

No. 8313.

Circuit Court of Appeals, Ninth Circuit.

Jan. 24, 1938.

John Flam and Phillip Grey Smith, both of Los Angeles, Cal., for appellants.

Fred H. Miller and Charles C. Montgomery, both of Los Angeles, Cal., for appellee.

Before WILBUR, MATHEWS, and HANEY, Circuit Judges.

WILBUR, Circuit Judge.

This is a patent infringement suit brought by the owner of letters patent 1,-803,875 to enjoin the use of the process therein described for surfacing the face of an oil well drill. The matter was referred to a special master over the objections of the appellants. The master found the patent claims involved to be valid and infringed. Exceptions were taken to the master's report, and overruled. The master's findings were sustained and adopted by the court, and an interlocutory injunction granted and an accounting ordered. From this interlocutory decree this appeal is taken.

The appellants attack the findings of validity and of infringement by appropriate assignments of error. The scope and character of the review of the findings of the special master is defined by the new Equity Rule 61½, 28 U.S.C.A. following section 723, promulgated May 31, 1932, before the master's report herein. The finding of fact and law are to be treated as presumptively correct, but subject to review by the trial court and by this court on appeal. Wilson-Western Sporting Goods Co. v. Barnhart, 9 Cir., 81 F.2d 108; Anraku v. General Electric Co., 9 Cir., 80 F.2d 958; Stewart-Warner Corp. v. Jiffy Lubricator Co., 8 Cir., 81 F.2d 786; Reinharts, Inc., v. Caterpillar Tractor Co., 9 Cir., 85 F.2d 628; Antonsen v. Hedrick, 9 Cir., 89 F.2d 149.

We proceed to a consideration of the findings and interlocutory decree. The first question to be considered is that of res judicata.

The patentee procured this process patent May 5, 1931, and upon an application pending at the patent office at the same time secured a product patent for a welding rod by letters patent No. 1,757,601.

The latter patent (No. 1,757,601) was before this court in Stoody Co. v. Mills

Alloys, Inc., 9 Cir., 67 F.2d 807. We there held that its claims were void for lack of invention. The patent covered a welding rod which was to be used for the surfacing of a drill in accordance with the teaching of the patent, and, therefore, covered the use of the welding rod for the purpose for which it was designed. This use, as disclosed by the patent, was to deposit and fasten the hard particles inclosed therein upon the face of the drill by melting the tube upon the face of the drill to which it adhered with the inclosed particles by reason of the welding of the molten metal of the tube to the heated surface of the drill. In describing the invention in the welding rod patent it is shown that the purpose of the invention was to furnish a tube filled with particles of hard material, preferably tungsten carbide, to be melted upon the face of the drill by the use of an acetylene torch.[1] We there approved the finding of the master that a tube designed for such purpose did not constitute invention in view of the state of the prior art. The master's finding on that subject, which we quoted in part in our former opinion (page 815) is set out in the margin.[2]

---

[1] "* * * The tube 1 is filled with broken pieces or particles 2 of an alloy, carbide or element such as black diamonds of great hardness and toughness; but we prefer to use an alloy set forth in our copending application for an alloy, containing tungsten and carbon, serial No. 250,699, filed January 30, 1928. The ends of the tube 1 are preferably pinched together as at 3 so as to confine the particles within the tube.

"In the use of the welding rod the tools are faced with a layer or skin of mild steel or metal of which the tube 1 is composed, in which layer the particles or pieces 2 are embedded. We prefer to use an acetylene torch in melting the welding rod. The particles 2 of the alloy or element having a considerable higher melting point than the mild steel of which tube 1 is composed, will not be affected by the acetylene torch. The metal of the tube 1 serves as a binder holding the particles 2 to the face of the tool. The skin or layer of metal in which the particles 2 are embedded is then provided with a surface layer of a hard tool steel, though the second layer of metal may be omitted. The method and resulting product of such facing of tools is described and claimed in our copending application, filed January 30, 1928, serial No. 250,698. The second layer of hard tool steel may be omitted, and the particles 2 embedded in the metal of the welding rod deposited on the face of the tool, may be used without the second layer of metal, and will produce good results."

[2] "Summing up the prior art it is found that at the time of the appearance of the welding rod of the patent * * *

"(1) It was common practice to combine in rod form various steel substances intended for deposit in a weld and to use a steel tube filled with alloying substances for the purpose.

"(2) It was known that tungsten carbide could be used advantageously in hard surfacing cutting tools.

"(3) It was known that tungsten carbide was not materially affected by a temperature of the degree of the acetylene torch and that it formed a bond with mild steel or other matrix metals. * * *

"It is true that the use of the tube of the patent results in a more facile and economical application of the material in a weld. However, in view of the state of the art the step taken did not involve the necessary element of inventive thought, but was an improvement logically coming from workers in the art, who applied their skill and knowledge to a given problem. * * *

"The device of the patent is simple, consisting of a tube of mild steel, or other substance having a comparatively low melting point, filled with small particles of tungsten carbide or other substance of a high melting point. It is intended for use in applying a hard facing to cutting tools. In the preferred method of use, the flame of an acetylene torch is applied to bring the surface of the tool to be faced to a welding temperature. After this is done the rod is heated until a portion of the tube is fused and falls down on the prepared surface, carrying with it the particles from the interior. These particles are not materially affected by the heat of the torch. They become embedded in the layer of steel from the tube that is formed on the surface of the tool. In use the hard particles embedded in a matrix of steel form abrasive cutting surfaces which resist wear in the manner of black diamonds. * * *

"The prior art * * *

"After it was discovered that tungsten carbide was not affected to any appreciable extent by the heat of the acetylene torch, it became customary to secure it in place by flowing mild steel or a hard surfacing alloy around it. A satisfactory bond resulted. * * *

"The hot rod method first came in use in 1926. It was useful in applying small particles of tungsten carbide to tools. The operator would heat a rod of steel to a welding temperature and then touch

The same master, in considering the patent for the process of applying the welding rod and its contents to the surface of the drill, sustained the patent and upon that finding the court enjoined the defendants from manufacturing or selling the welding tube covered by the void patent (No. 1,757,601) because it was held that the manufacture and sale of the welding rod was a contributory infringement of the process covered by patent No. 1,803,875. It also enjoined the sale of a welding rod in which the tungsten carbide particles had been embedded in the metal of the rod instead of being inclosed loosely in a welding tube. The appeal is from this decree. If this decree is affirmed by us and if, also, we adhere to our former opinion as to the invalidity of the product patent, it would follow that the product (the welding rod) patent which we held invalid would be made effective through the process patent.

The appellants rely strongly upon the doctrine of res judicata to support the conclusiveness of the facts found in the former case to establish the invalidity of the patent in suit.

■■■■ One of the issues in the former case was the factual one of invention. It was there held that no invention was involved in producing a welding rod to be used according to the teaching of the patent. The court declined to enjoin the manufacture, sale, or use of the welding rod described in the patent. The finding that there was no invention in the welding rod not only implied a finding that there was no invention in the only use for which the rod was designed, but also there were express findings that the method of applying

face hardening material such as tungsten carbide to a well drill by inclosing or incorporating them in a welding tube or rod and melting the rod on the face to be hardened was not new and did not call for the exercise of inventive genius. The question as to whether the proposed use of the welding rod was new or old was inherent in the question of invention in the welding rod itself. The proposed use of the welding rod could not be ignored in litigation over the question of whether or not the inventive faculty was exercised in its manufacture. It is true that the two patents are different and that the invalidity of one would not necessarily invalidate the other, but where the litigation in each case turns upon the question of the novelty of the manner of use, the adjudication of invalidity of the process (or manner of use) patent follows as an inevitable conclusion from the finding of lack of novelty in the product patent. As to general principle, see Freeman on Judgments, 5th Ed., vol. 2, p. 1469, § 695 et seq. This conclusion, we think accords with the view expressed by the Second Circuit Court of Appeals in Vapor Car Heating Co. v. Gold Car Heating & Lighting Co., 7 F.2d 284, 287. The master should have held the claims of the process patent here involved invalid for lack of invention because that lack was conclusively established by the prior finding and decree.

Furthermore, if we now adhere to the views expressed in the previous opinion, the same result follows because the evidence upon which that finding is based in the former case has been introduced in the main case, hence, it would follow that

the hot end of the rod to the small particles of tungsten carbide. The particles would adhere to the rod. The operator would then melt off the end of the rod causing the steel and the tungsten carbide particles to fall on the part to be surfaced. The particles of tungsten carbide were not materially affected by the heat of the torch. * * *

"Validity * * *

"Hard materials of high melting point, such as tungsten carbide had been previously used for hard surfacing. Hard surfacing materials had been extensively applied by a welding process. Mills, Jones and others had previously used or described tubes filled with materials to be deposited by welding. Tungsten carbide was a comparatively new hard surfacing material, and as soon as it was

commercially available in small particles it was an obvious step to place it in a tube of mild steel for convenient use. The character of the weld produced was not new. The previous use of tungsten carbide by imbedding it in steel or by the hot rod had produced the same type of weld, i. e., tungsten carbide embedded in steel.

"This result is due to an inherent characteristic of tungsten carbide in that it is not materially affected by ordinary welding temperatures. This incident of the use of tungsten carbide cannot be relied upon to give validity to broad structural claims of the character here in issue * * * The plaintiff's theory of invention is based upon the differences in melting point as effecting the type of weld produced. * * * "

whether we rely upon the evidence herein of the prior art, or upon the doctrine of res judicata, our holding would be the same; namely, that the state of the prior art embraced the application on face hardening material to the surface of a well drill by incorporating or inclosing the hard material in a welding tube to be melted on the face of the drill by the use of an acetylene torch, or otherwise.

There is one notable exception between the prior art shown in this case and that shown in the former case. In the prior case the master concluded that the "hot rod method" of applying the tungsten carbide anticipated the product patent. In the present litigation he finds that the "hot rod method" was used a year later than he held in the former case, and that its use was by the patentee only, and shortly before, or immediately after, the present invention. Thus, in considering the evidence of the prior art, we must either ignore this particular alleged prior use or reverse the decision of the master on that subject reached by him after hearing the conflicting testimony of the witnesses who appeared before him, as to a date, where documentary evidence pointed toward the conclusion reached by the master. We should not do this except upon the principle of res judicata. Consequently, we will in our present inquiry ignore the hot rod method and consider the other prior art only. We will now consider that evidence.

In arriving at the conclusion that the process patent was valid, the master was strongly impressed by the fact that tungsten carbide was a recent metallurgical product whose reactions to the application of the intense heat were not entirely understood and that the patentees having discovered that the carbide particles could be applied to the face of the tools by the welding process retaining their hardness without impairment were entitled to the award of the patent for their inventive genius.[3] Evidence was offered to show the various experiments conducted by the patentees with a view of determining the best method of applying this newly produced product to the face of the drilling tool. It appears that other methods were tried, including grinding the tungsten carbide to uniform sizes and shapes and embedding them in holes countersunk in the face of the drill by soldering with molten brass or other soft material. It was known while these experiments were being conducted that tungsten carbide is almost as hard as diamond (98 per cent. to 99 per cent., or, 9.8 to 9.9). It was also known that tungsten carbide has an extremely high melting point as compared to iron, or mild steel. The relative melting point of mild steel and tungsten carbide is as 2,600° F. is to 5,400° F. It was known that it did not soften or fuse at any lower temperature, and that it had the tenacity or strength of high speed steel.[4] It was also known from German patent No. 427,074 issued to Siemens and Halske March 22, 1926, that tungsten carbide in the form of grains could be mixed with molten metal and become imbedded therein without forming an alloy. From these known characteristics of tungsten carbide it was evident that the iron of a welding rod or tube could be melted without melting the tungsten carbide inclosed in the tube. However, the acetylene torch has a very high temperature at the apex of the cone of the flame. This temperature is about 6,000° F. It is thus apparent that if the hottest part of the acetylene flame is played upon the tungsten carbide for too long a time it might cause melting. It was feared also that the flame

---

[3] "Other rods of composite materials were designed for the same use with the exception that the materials formed an alloy when fused during deposition. The Mills Oxite rod is an example. * * *

"It was intended that the rod be used with an acetylene torch to produce a homogeneous alloy in the resulting weld. At times the weld produced was rough in appearance due to the failure of all the material to fuse under the heat of the torch. The materials forming the unfused portions of the weld have not been identified. No embedding of hard particles was either intended or appreciably accomplished. The use of the Oxite rod did not anticipate the method of the patent. * * *

"In view of the state of the art at the time of the disclosure of the method of the patent it was not known that tungsten carbide and mild steel could be combined together and simultaneously deposited in a weld by the heat of an acetylene torch to produce a weld in which the tungsten carbide particles would be held embedded in a matrix formed by the steel."

[4] "Iron Age," issue July 16, 1925, article entitled "German Alloy of Diamond Hardness."

might crack the tungsten carbide particles. It is only necessary, however, to make the obvious experiment to determine the fact that the tungsten carbide particles were not melted and were not cracked and were secured to the face of the tool by the steel as it cooled. Here it should be stated that the process patent under consideration discloses none of the difficulties apprehended in the use of carbon tungsten and taught no method of avoiding these difficulties. Moreover, the patent process did not relate to the application of tungsten carbide alone, but expressly included all other hardening alloys or metals whose melting point was higher than that of mild steel. All were to be applied in the same way. Some of these materials would no doubt form an alloy with the molten mild steel of the tube and with the visced face of the drill, others, like tungsten carbide, would remain embedded in the metal in hard particles.

In considering the claims of the patentees the master was evidently impressed by the contention which he had not fully considered in the other case that in the former art the hard material which had been applied to the face of the drill by the use of a welding tube or rod, was incorporated therein as an homogeneous alloy so that the hardness of the face of the drill after the operation resulted from the incorporation into the steel face of the drill as an alloy of steel of the metal or alloy which had been contained in the tube or welding rod, whereas, in the case of tungsten carbide, the material deposited did not enter into combination with the metal of the drill or the molten metal from the tube to form an alloy, but remained deposited upon the surface of the tool although embedded in the steel as an independent hard heterogeneous mass inclosed in a matrix of mild steel so that as the mild steel was worn away by the operation of the drill the tungsten carbide became exposed to form the cutting surface of the drill. (See note 3)

■ The question is whether or not the application of a process old in the art to the new product constitutes invention. It is clear that the most that can be said of the efforts of the patentees to successfully apply the newly produced hard alloy (tungsten and carbon) to the face of the tool was that they discovered that it could be applied in the usual manner; that is to say, they discovered that the characteristics of the tungsten carbide supplied to them by the manufacturers, or produced by them, were such that by the use of an old process it could be applied to the surface of the drilling tool. The bare bones of the process of the patent consist in the application to the surface of the drill of face hardening material by inclosing the hardening material in molten steel which adheres to the face of the drill by welding action.

While it is true, as the master held, that this face hardened drill constituted a different result from that produced by the process of applying a substance which would form an alloy with the face of the tool, no invention was involved over the prior art because the process of application was exactly the same as disclosed by the prior art for applying face hardening materials. The beneficial result was brought about by using a new product and not by the use of a new process. This does not ordinarily constitute invention. David E. Kennedy, Inc., v. Beaver Tile & Specialty Co., D.C., 232 F. 477; see, also, Paramount Hosiery, etc., Co. v. Moorhead Knitting Co., D.C., 251 F. 897; Id., 3 Cir., 260 F. 841. We have so far assumed that the method of applying face hardening material to the surface of a drill by incorporating or inclosing it in a mild steel welding rod, the material to be added by melting the rod against the face of the drill to be hardened, was old, as we held in the former case. Stoody Co. v. Mills Alloys, Inc., 9 Cir., 67 F.2d 807. However, as we are now dealing with the facts upon the assumption that the prior decision was not conclusive on that subject, we now point out some of the facts of prior use in proof herein which would cause us to adhere to our former ruling even if we were not bound to do so by the principle of res judicata. The Mills patent, No. 1,650,905 applied for December 21, 1925, issued November 29, 1927, taught the use of a welding rod to apply materials inclosed therein, referred to as a composition. The patent states: "The composition can be such as to provide a wearing layer of high grade alloy steel when welded on worn cutting tools, such as on well drill bits. * * * Of course my invention is not limited to the precise form of container for the composition; in fact, in some instances the container itself enters materially into the ultimate composition of the matter welded. * * * The composition can be such as to alloy with the bar 13 when welded to

form a high grade steel alloy, such as tungsten steel, nickel chromium steel, or vanadium steel."

The patent to Jones, No. 1,387,157, applied for September 18, 1918, issued August 9, 1921, taught the method of applying metal alloys for hardening tools by inclosing the alloy in a welding rod and melting it upon the surface of the metal to be treated, by the use of an oxyacetylene or other blow · pipe. The patent states: "Again; all the materials necessary for the depositing of what is known as 'high speed steel' may be combined in a welding rod; for example, a channel section mild steel welding rod with a carbon of cast iron content, and a suitable proportion of vanadium, cobalt, tungsten, molybdenum, chromium, aluminum, or the like may be employed for depositing metal on the cutting parts of tools, dies and the like."

The German patent, No. 427,074, issued to Siemens & Halske, describes the method of producing objects of great hardness from tungsten carbide by placing fine particles or grains thereof in a molten metal or alloy or soft metal or alloys, like iron, nickel, cobalt. The patent discloses that with a cobalt chomium alloy the tungsten carbide completely dissolves forming a completely homogeneous mass, "while with some other metals we find merely an imbedding."

In an article published in a German publication, Gluckauf, the use of tungsten carbide ("Thoran") to the surfacing of drilling tools is extensively discussed and the properties of the new alloy (tungsten carbide) are particularly described, and its use indicated for the cutting surface of rock drills, the method of its application to such surfaces is by setting and soldering into the surface "with brass or hard solder."

Patent No. 1,698,936, applied for in 1924 and issued June 15, 1929, teaches the embedding of hard crystals of tungsten carbide, and other hard carbides, in a metal (such as iron) matrix. The patent states: "In addition to heat resistance, the alloy must also possess abrasive hardness and for this purpose should contain embedded in the metallic matrix hard crystals, usually metallic carbides." In view of the foregoing there was no invention in the patent method, and the finding of invention cannot be sustained.[5]

In view of our conclusion it is unnecessary to discuss other points covered by the briefs.

We conclude, first, that the question of invention is not open because the decree in the former case determines that there was no invention; second, that the prior art shown in evidence in this case, even without the aid of the former decree, requires a finding by us of lack of invention, and we do so find; third, that the claims of the patent in suit (Nos. 5, 6, 7, 10, 11, 12, 13, 14, 15, and 17) are invalid.

The interlocutory decree is reversed.

---

[5] See last paragraph note 3.